**HARRODS LIMITED, Plaintiff,**

v.

**SIXTY INTERNET DOMAIN NAMES, Defendants.**

**No. CIV. A. 00–262–A.**

United States District Court, E.D. Virginia. Alexandria Division.

June 27, 2001.

Ralph A. Taylor, Jr., Bruce R. Ewing, Kevin B. Bedell, Lile H. Deinard, Dorsey & Whitney LLP, Washington, DC, for Plaintiff.

Rodney H. Glover, Attison L. Barnes, III, Gardner, Carton & Douglas, Washington, DC, for Defendants.

## MEMORANDUM OPINION

BRINKEMA, District Judge.

This Memorandum Opinion reports our findings of fact and conclusions of law in this *in rem* civil action, brought under the Anti–Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C.A. § 1125(d), *et seq.* (West Supp.2000). This action presents exceedingly unique factual circumstances because both the plaintiff, England-based Harrods Limited, and the registrant of the defendant Domain Names, Harrods (Buenos Aires) Limited, possess varying intellectual property rights in the name "Harrods." The defendants, sixty Internet domain names,[1] were registered in this district by representatives of Harrods (Buenos Aires) Limited ("HBAL"), an entity created under English law and domiciled in Argentina.[2] Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, and for the reasons stated below, we conclude that Harrods Limited has prevailed in this *in rem* action under the ACPA.[3]

1. The defendants are the following discrete second-level domain names, registered in each of the .com, .net, and .org generic top-level domains: harrodssouthamerica, harrodsbrasil, harrodsbrazil, ciberharrods, cyberharrods, harrodsbank, harrodsbanking, harrodsfinancial, harrodsservices, harrodsvirtual, harrodsstore, tiendaharrods, harrodsamerica, harrodssudamerica, shoppingharrods, harrodsshopping, harrodsbashopping, harrodsshoppingba, harrodsargentina, and harrodsbuenosaires.

On October 6, 2000, we granted defendants' Motion for Partial Summary Judgment as to harrodsargentina.com, harrodsargentina.net, harrodsargentina.org, harrodsbuenosaires.com, harrodsbuenosaires.net, and harrodsbuenosaires.org. The remaining fifty-four domain names were the *in rem* defendants at trial.

2. The defendants will be interchangeably referred to as the "defendant Domain Names" or "HBAL."

3. Plaintiff's claims arise under the Lanham Act, 15 U.S.C.A. § 1114, *et seq.*, as amended November 29, 1999. Subject-matter jurisdiction arises under 28 U.S.C.A. § 1331 (federal question), §§ 1338(a) and (b) (unfair competition), and 15 U.S.C.A. § 1121 (Lanham Act).

*In rem* jurisdiction over the defendant Domain Names is established under 15 U.S.C.A. § 1125(d)(2)(C) because *in personam* jurisdiction is lacking over their registrant, HBAL, which would otherwise have been the defen-

## I. *Findings of Fact* [4]

Plaintiff, Harrods Limited, was founded in 1849. Its primary business has been the continuous operation of a department store in the Knightsbridge section of London, England. The store occupies approximately 4.5 acres of land. Harrods Limited daily attracts approximately 35,000 customers, who annually generate approximately £500 million of revenue. It employs approximately 3,500 employees. Within the confines of the Harrods Limited store, and in several airports worldwide, are "Harrods Shops," which sell exclusively Harrods-branded merchandise.

Harrods Limited provides countless goods and services, hence its motto, "Omnia, Omnibus, Ubique" (all things for all people, everywhere). An entire floor of Harrods Limited's store is devoted to sports, fitness, and health and beauty goods and services. Much of another floor contains Harrods Limited's extensive toy department.

Harrods Limited's grocery trade is one of its most distinctive features, dating back to 1849. The Food Hall at the Knightsbridge store opened in the early 1900s and is one of the most extensive food halls in Europe, offering a wide variety of gourmet foods and groceries from around the world. In connection with its Food Hall, Harrods Limited consults on food services for dinner parties and special occasions. It has published books on food, including THE HARRODS COOKERY BOOK and HARRODS BOOK OF CHOCOLATES AND OTHER EDIBLE GIFTS. Similarly, plaintiff's store includes a complete wine shop, offering wines from around the world, as well as its own label. In 1990, Harrods Limited published a book on wines and winemaking, HARRODS BOOK OF FINE WINES.

Harrods Limited also operates Air Harrods out of Heathrow, Stansted, and Luton Airports, and London Battersea heliport. It also owns a full-service travel agency, offering an array of travel services and reservations.

Plaintiff has also been involved with banking services since approximately 1890. Harrods Bank, located in the Knightsbridge store, offers full banking and investment services to customers in the United Kingdom and around the world. It has issued approximately 210,000 account cards: approximately 150,000 of which are active. Additionally, Harrods Bank offers financial, brokerage, insurance, mutual funds, investments, and loan services. Harrods Limited also provides real estate services. Harrods Estates, founded over one hundred years ago, offers real estate sales, leasing services, and serves as a property developer and manager.

Although Harrods Limited has no sales outlets in the United States, it has advertised here for almost seventy-five years. Approximately 5,000 United States residents are Harrods Limited account customers. Moreover, Harrods Limited has distributed catalogs worldwide and has made millions of dollars in mail-order sales in the United States and worldwide over the last century.

---

dant in an action brought under 15 U.S.C.A. § 1125(d)(1).

Venue is proper in this judicial district pursuant to 28 U.S.C.A. § 1391 and 15 U.S.C.A. § 1125(d)(2)(c) because the defendant Domain Names were registered with Network Solutions, Inc., a corporation in this judicial district.

**4.** The parties' history of business dealings and litigation has been thoroughly discussed in two English court decisions, which are part of the documentary evidence in this action. *See Harrods Ltd. v. Harrods (Buenos Aires) Ltd.,* 1997 F.S.R. 420 (Ch.1997) *("Harrods I "), aff'd,* 1999 F.S.R. 187 (Ch.App.1998) *("Harrods II ").*

The registrant of the defendant Domain Names, Harrods (Buenos Aires) Limited ("HBAL"), is a company created under English law, domiciled in Argentina. *See Harrods I, supra,* 1997 F.S.R. at 426. Plaintiff formed HBAL's predecessor, Harrods South America Limited ("HSAL"), to carry on its business in South America. *See id.* at 426–27. In 1912, HSAL, a wholly-owned subsidiary of Harrods Limited, opened a store called Harrods on the fashionable Calle Florida in Buenos Aires, Argentina. *See id.* In 1913, Harrods Limited established HBAL as an independent company to ensure the separation of corporate assets between the English and Argentinian stores. *See id.* Harrods Limited and HBAL intended for plaintiff to serve as HBAL's non-exclusive buying agent. *See id.* In 1914, HBAL constructed a new four-story building to house its store, which was designed to resemble plaintiff's London store. *See id.* at 429. Each party operated its respective store, and by the mid–1920s, Harrods Limited was no longer HBAL's buying agent. *See id.* Also in the 1920s, HBAL took over all of HSAL's rights. *See id.* at 433.

By 1948, the parties' only connection was Harrods Limited's ownership of de-ferred shares in HBAL. *See id.* By 1963, Harrods Limited had sold all of those deferred shares on the open market and the two parties have had no further legal connection. *See id.* By the early 1960s, HBAL's business was in decline. It discontinued its once-impressive catalog sales and its store began to deteriorate. In 1970, a group of entrepreneurs, financed by merchant bank William Brandts Sons & Company ("Brandts"), unsuccessfully attempted to revive the once vibrant Buenos Aires store. Brandts exercised its lien and acquired HBAL in 1973. *See id.* at 434.

Over the past several decades, HBAL registered several "Harrods" trademarks in South America. For example, HBAL registered "HARRODS" as a trademark in Argentina, Bolivia, Chile, Colombia, Paraguay, Peru, Uruguay, and Venezuela. *See Harrods II, supra,* 1999 F.S.R. at 194. In 1974, plaintiff learned that HBAL had registered a "HARRODS" trademark in Argentina in a script very similar to Harrods Limited's longstanding logo.[5] After a lengthy exchange of correspondence, HBAL canceled that trademark registration in 1976, agreed not to use a script that resembled the plaintiff's script, and

---

**5.** HBAL's logo, registered in 1974 and canceled in 1976:

adopted a new and different logo.[6] *See Harrods I, supra,* 1997 F.S.R. at 434–35.

While Brandts controlled HBAL, Harrods Limited contacted the Receiver appointed by Brandts to find out whether Brandts would be willing to enter into an agreement to "sub-divi[de] the world so the two Harrods would not compete." *Id.* at 434. No binding contract was made, but the Receiver recalled during later litigation that he "was left with the firm impression that [Harrods Limited] would be happy not to compete with HBAL in South America, if HBAL did not compete with the plaintiff in the rest of the world." *Id.*

In 1979, Brandts sold HBAL to Intercomfinanz Holdings ("Intercom") and Ladenimor S.A.,[7] who agreed to continue operating the store for at least five years. Atilio Gibertoni, a key trial witness, was a major shareholder of Intercom. HBAL's Buenos Aires store continued to decline. By 1994, HBAL occupied less than half of the ground floor of the famed building. The remainder of the ground floor and the second floor were leased to approximately 140 wholly independent Argentinian companies.

In 1994, intermediaries purporting to act on HBAL's behalf contacted plaintiff to gauge its interest in acquiring HBAL. Plaintiff responded to HBAL by expressing its skepticism of the intermediaries' actions and noting that it found the approaches insulting.[8] Harrods Limited con-

Harrods Limited's longstanding logo:

6. HBAL's logo since 1976:

7. CBC International Ltd. eventually replaced Ladenimor S.A. as a shareholder.

8. Part of the letter stated:
 [Y]ou can see what garbage is being put out in your name and we are very surprised that you should have utilized their services for what is presumably an important matter for you.... How can you expect us to respond meaningfully to such a succession of half-baked approaches by lowly minions around the world? Is this a measure of the mediocrity of your Company and your management style?
 Plaintiff's Exhibit ("PEX") 7, at 1.

tinued that it regarded the literature being circulated on HBAL's behalf as its attempt to mislead prospective investors and customers into believing that the two companies were related. *See* PEX 7. It demanded that HBAL immediately cease and desist any actions intended to link the two companies. *See id.*

HBAL denied any role in the approaches, instead characterizing the alleged intermediaries as "extremely unserious commission-hunters." PEX 8. HBAL also denied responsibility for the allegedly infringing literature purportedly circulated on HBAL's behalf. *See id.* Finally, HBAL noted that Atilio Gibertoni, the only person permitted to speak on its behalf, was willing to meet with representatives of Harrods Limited to impart "more detailed information about [HBAL's] activities, and with the objective of maintaining an amiable relation" with Harrods Limited. *Id.*

In February 1995, the parties met. Plaintiff's former Managing Director Clive DeBoer testified via a *de bene esse* deposition that Harrods Limited attended the meeting to gain information about Gibertoni and HBAL so that it could safeguard its name. *See* DeBoer Tr. at 58. At the meeting, according to DeBoer, Gibertoni proposed a joint venture between the parties. *Id.* at 63. The Chairman of Harrods Limited, Mohamed al Fayed, offered to buy out the HBAL shareholders' investment at a ten percent profit[9] and allow HBAL to keep a franchise on the ground floor of the Buenos Aires store as a Harrods "signature shop." *Id.* at 65.[10] Gibertoni countered that he would be willing to sell HBAL only for its current valuation, taking into account Argentinian inflation rates. Gibertoni estimated that HBAL was worth approximately $200 million.[11] After the meeting ended, the parties continued negotiating. Harrods Limited finally offered $10 million to buy HBAL. The parties, however, were several million dollars apart and each had differing visions of what would be conveyed under the sale. Therefore, no sale was ever consummated.

In July 1995, shortly after the negotiations ceased, Harrods Limited sued HBAL in England seeking injunctions for HBAL's alleged passing off (trademark infringement), breach of contract, and breach of fiduciary duty. Harrods Limited also sought a declaration that HBAL held the "HARRODS" trademark in trust for Harrods Limited. In January 1997, the High Court of Justice dismissed the action.[12] The Court of Appeal dismissed plaintiff's appeal in 1998, holding that there was an irrevocable implied contract for HBAL to "carry on business under the name Harrods anywhere in South America." *Harrods II*, 1999 F.S.R. at 193.

In June 1998, HBAL engaged an agent, Manuel A. Solanet of INFUPA S.A., an Argentinian financial advisory company, to broker a sale of HBAL to Harrods Limit-

---

**9.** Although the testimony is unclear, al Fayed appeared to offer Gibertoni $5 million.

**10.** The scope of al Fayed's offer is unclear, because DeBoer later testified that the offer was to acquire HBAL and "all the business with the name and the implied advantages that go with the name in South America," including the building. DeBoer Tr. at 70.

**11.** At least since 1994, HBAL has told Harrods Limited of numerous alleged deals or arrangements it was about to enter with third parties as part of an attempt to persuade plaintiff to purchase some or all of HBAL. *See, e.g.,* PEX 13 and 17. Obviously, none of those arrangements ever materialized, and given our lack of confidence in Gibertoni's credibility, we doubt the accuracy of those allegations.

**12.** The court permitted plaintiff leave to withdraw the passing off claims, subject to certain conditions imposed on each party. *See* PEX 69.

ed. Harrods Limited, however, refused to bid on HBAL. *See* PEX 20. In July 1998, HBAL approached Harrods Limited yet again, offering to sell the company for $60 million. Again, Harrods Limited refused. Later that year, HBAL closed the Buenos Aires store. Since then, HBAL's only business has been the operation of a parking garage attached to the Buenos Aires store. HBAL employs about a dozen employees to carry on this work. For the last two reported fiscal years, HBAL generated only $355,000 and $300,000 in gross revenue, all from the parking garage.

In February 1999, Harrods Limited launched its website, accessible at www.harrods.com. On September 7, 1999, Harrods Limited announced in various print and online news media that it would debut an online shopping service in time for the upcoming winter-holiday season. On that same day, HBAL began registering nearly 300 domain names in Buenos Aires, Maryland, and Virginia.[13] The decision to register the domain names, the choice of domain names, and their registration were the responsibility of Gibertoni and Raul Drelichman.

Gibertoni testified that he conceived of entering e-commerce in 1999, however, he admitted that HBAL had no concrete business proposal for use of the Domain Names when they were registered. In January or February 2000, Boltendahl Business & Strategy, an Argentinian entity, produced a business proposal for the defendant Domain Names at a cost to HBAL of $20,000. *See* PEX 4.[14] HBAL rejected that proposal, and commissioned Ernst & Young to prepare another business proposal at a cost of $50,000. No such proposal was presented at trial. There is also no evidence in this record that any goods or services have been offered through any of the defendant Domain Names or at any of the websites associated with the defendants.

## II. Conclusions of Law

### A. The Anti–Cybersquatting Consumer Protection Act

The Anti–Cybersquatting Consumer Protection Act ("ACPA"), enacted on November 29, 1999, was Congress' response to an onslaught of e-savvy entrepreneurs who amassed domain names incorporating protected trademarks for their own exploitation via sale or use. *See generally* S. Rep. 106–140 (1999); *see also Virtual Works, Inc. v. Volkswagen of America, Inc.*, 238 F.3d 264, 267 (4th Cir.2001) (describing in detail Congress' impetus to pass the Act). Finding such registrations abusive, Congress enacted the ACPA "to protect consumers, promote the continued growth of electronic commerce, and protect the goodwill of American businesses." S. Rep. 106–140, at 6 (1999).

Under the ACPA, liability is imposed on a person who

(i) has a bad faith intent to profit from [a mark]; and

---

**13.** Although plaintiff was unable to prove that Gibertoni had the Domain Names registered after reading the news article about Harrods Limited's online presence, the coincidence is highly suspicious.

**14.** The business proposal contained in PEX 4 and corresponding trial testimony were placed under seal pursuant to the Protective Order entered on November 27, 2000. After thoroughly reviewing the evidence, we find that PEX 4 cannot properly be accorded protected status. Our finding is based on Gibertoni's admission that HBAL has rejected the business proposal. *See* Tr. at 463. Accordingly, a balancing of an enterprise's right to protect its *bona fide* business plans and the public's right to access court files weighs decidedly in favor of removing PEX 4's protected status. The Protective Order remains in effect as to all other documents.

(ii) registers, traffics in, or uses a domain name that -

(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;

(II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or

(III) is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.

15 U.S.C.A. § 1125(d)(1)(A) (West Supp. 2000).

A plaintiff who cannot secure personal jurisdiction over the registrant of an allegedly-infringing domain name may bring an *in rem* action against the domain name. *See* 15 U.S.C.A. § 1125(d)(2)(A) (West Supp.2000). Under such circumstances, the

owner of a mark may file an *in rem* civil action against a domain name in the judicial district in which the domain name registrar ... is located if

(i) the domain name violates any right of the owner of a [registered trademark]; and

(ii) the court finds that the owner -

(I) is not able to obtain *in personam* jurisdiction over a person who would have been a defendant in a civil action under paragraph (1)....

*Id.*

Although not explicitly stated in § 1125(d)(2)(A), we have previously found that Congress intended to require a plaintiff to plead and prove, as an element of an *in rem* action, that the domain name registrant had a "bad faith intent to profit"

from plaintiff's mark. *See Harrods Ltd. v. Sixty Internet Domain Names*, 110 F.Supp.2d 420, 425–26 (E.D.Va.2000).

The ACPA specifies nine factors to be used in determining whether a registrant has a "bad faith intent to profit." Those factors are:

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the *bona fide* offering of any goods or services;

(IV) the person's *bona fide* noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert customers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the *bona fide* offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact infor-

mation when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous....

15 U.S.C.A. 1125(d)(1)(B) (West Supp. 2000).

In addition to the nine listed factors, a court may rely on other indicia of bad faith intent to profit. "[T]he most important grounds for finding bad faith 'are the unique circumstances of th[e] case, which do not fit neatly into the specific factors enumerated by Congress but may nevertheless be considered under the statute.'" *Virtual Works*, 238 F.3d at 268 (quoting *Sporty's Farm, L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 499 (2d Cir. 2000)). Congress also carved out a "safe harbor" by prohibiting a finding of bad faith intent to profit if the court "determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C.A. § 1125(d)(1)(B)(ii) (West Supp.2000).

## B. *Standard of Proof*

■ At the outset of our analysis, we are called upon to decide as a matter of first impression what standard of proof applies to *in rem* proceedings under the ACPA. Citing the absence of any different standard of proof in the language of the ACPA, plaintiff contends that it need only prove the elements of its ACPA claim by a preponderance of the evidence.

The defendant Domain Names, on the other hand, contend that the proper standard is one of clear and convincing evidence. The overarching theme of defendants' argument is that our legal system usually requires clear and convincing proof of "bad" intent. *See, e.g., Addington v. Texas*, 441 U.S. 418, 423, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (heightened standard of proof often used "in civil cases involving allegations of fraud or some other quasi-criminal wrongdoing by the defendant"). Specifically, defendants argue that clear and convincing evidence is the proper standard because the ACPA was meant to be "narrowly-tailored" and the Lanham Act and admiralty law sometimes require clear and convincing evidence.[15]

The ACPA does not specify the standard of proof. It only provides that "a person shall be liable ... if ... that person ...

---

**15.** In their Supplemental Authority on Burden of Proof, defendants argue that although Congress did not address in the Immigration and Nationality Act the proper standard of proof in deportation proceedings and denaturalization cases, the Supreme Court held that it was within the province of the judiciary to require clear and convincing evidence under such circumstances. *See* Deft. Mem. Supp. Auth. at 1–2. (citing *Woodby v. INS*, 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966) and *Schneiderman v. United States*, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943)). We find those cases inapposite because the sheer importance of immigration proceedings dictates a higher standard of proof.

has a bad faith intent to profit from [the plaintiff's trademark] and registers, traffics in, or uses a domain name" in violation of the Lanham Act. 15 U.S.C.A. § 1125(d)(1)(A) (West Supp.2000). The language "a person shall be liable" would normally lead to a conclusion that the typical preponderance of the evidence standard should be applied given that the preponderance standard is generally used in civil actions involving "monetary dispute[s] between private parties." *Addington, supra,* 441 U.S. at 423, 99 S.Ct. 1804. In *Addington,* the Supreme Court rationalized the use of this standard in typical civil actions because of society's "minimal concern with the outcome of such private suits." *Id.* Although the remedy available under the ACPA is not monetary damages, society's overall concern is similarly minimal because all that is at stake is the forfeiture or cancellation of the infringing domain name, or transfer of the domain name to the plaintiff; no other relief is available. *See* 15 U.S.C.A. § 1125(d)(2)(D)(i) (West Supp.2000); *see also Harrods Ltd. v. Sixty Internet Domain Names,* 110 F.Supp.2d 420, 424–25 (E.D.Va.2000).

Moreover, if Congress had intended to require a greater standard of proof, it could have said so explicitly. Instead, it neither expressly included a heightened standard, nor implicitly hinted at such a standard. Therefore, we will not belatedly add one. *See, e.g., Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (the Bankruptcy Code's silence as to standard of proof is "inconsistent with the view that Congress intended to require a special, heightened standard"). For these reasons, we conclude that preponderance of the evidence is the correct standard of proof.

Our conclusion is consistent with the Fourth Circuit's reasoning in *Glover v. Ampak, Inc.,* 74 F.3d 57 (4th Cir.1996). In *Glover,* the Fourth Circuit determined that the preponderance of the evidence standard applies to actions seeking cancellation of a trademark under the Lanham Act. *Id.* at 59. In both *in rem* ACPA actions and trademark cancellation actions, a prevailing plaintiff's remedy is the divesting of a purported owner's property rights. Use of the same standard of proof is therefore appropriate.[16]

Moreover, none of the courts which have considered suits under the ACPA has articulated use of the clear and convincing standard of proof. *See, e.g., Virtual Works, Inc. v. Volkswagen of America, Inc.,* 238 F.3d 264, 270 (4th Cir.2001) ("[V]iewed in its totality, the evidence establishe[d] that [defendant] was motivated by a bad faith intent to profit...."); *People for the Ethical Treatment of Animals, Inc. v. Doughney,* 113 F.Supp.2d 915, 920 (E.D.Va.2000) (applying the ACPA bad faith factors and finding that "it appears

---

**16.** Defendants correctly note our previous decision that admiralty law may provide guidance to certain procedural aspects of *in rem* proceedings under the ACPA. *See Caesars World v. Caesars–Palace.Com,* 112 F.Supp.2d 505, 509 (E.D.Va.2000). From that decision they argue that the "uniform rule in admiralty law is that a finding of abandonment requires proof by clear and convincing evidence." *Fairport Int'l Exploration, Inc. v. The Shipwrecked Vessel Captain Lawrence,* 177 F.3d 491, 500 (6th Cir.1999).

Defendants' position suffers from two flaws. First, the *Caesars World* decision in no respect addressed standards of proof. Rather, it concerned the narrow issue of whether a defendant domain name has an obligation to respond to discovery and, if so, whether the person or entity which registered the domain name exposes itself to personal jurisdiction by filing discovery responses. Second, given that the ACPA is an amendment to the Lanham Act, it is more appropriate to follow trademark law where admiralty law might be inconsistent with the Lanham Act.

that [defendant] had the requisite bad faith intent"); *Lucent Technologies, Inc. v. Lucentsucks.Com*, 95 F.Supp.2d 528, 535 (E.D.Va.2000) ("[N]o civil action for trademark infringement or dilution lies under the ACPA unless the registrant's bad faith intent is demonstrated."); *E. & J. Gallo Winery v. Spider Webs, Ltd.*, 129 F.Supp.2d 1033, 1045 (S.D.Tex.2001) ("[A] review of the nine factors provides ample evidence [that defendant acted] with a bad faith intent to profit" and the "facts established by [plaintiff] provide adequate evidence" of a bad faith intent to profit); *Advance Magazine Publishers v. Vogue International*, 123 F.Supp.2d 790, 800 (D.N.J.2000) (finding "sufficient evidence of the bad faith intent of defendants"); *Mattel, Inc. v. Internet Dimensions, Inc.*, No. 99 Civ. 10066(HB), 2000 WL 973745, at *6 (S.D.N.Y. July 13, 2000) (finding that the defendants acted with a bad faith intent to profit "based on the evidence in the record, and a weighing of the nine factors set forth in the Act"). Because the many courts that have decided actions under the ACPA have neither included express language regarding the requisite standard of proof, nor implicitly conveyed application of a more stringent standard, we conclude that the general preponderance of the evidence standard has been applied uniformly.

C. *The Distinctiveness of the HARRODS Trademark*

■ Under well-settled principles of trademark law, a trademark is distinctive if it either is "inherently distinctive," insofar as it is neither generic nor descriptive, or if it has a "secondary meaning" and thus is distinctive based on use in commerce over time. *See Ashley Furniture Indus. v. Sangiacomo N.A., Ltd.*, 187 F.3d

363, 368–69 (4th Cir.1999); *see also Teaching Co. Ltd. Partnership v. Unapix Entertainment, Inc.*, 87 F.Supp.2d 567, 575–76 (E.D.Va.2000).

■ At trial, Harrods Limited presented three incontestable federal trademark registrations for the HARRODS trademark. PEX 39, 40, and 42. These registrations were issued in 1985, 1993, and 1995, before the defendant Domain Names were registered and before this action was filed. Plaintiff's ownership of these incontestable registrations creates a presumption that its mark is inherently distinctive. *See Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 497 (2d Cir. 2000) (finding "SPORTY'S" distinctive for similar reasons); *see also Equine Technologies, Inc. v. Equitechnology, Inc.*, 68 F.3d 542, 545 (1st Cir.1995). Lacking any evidence to overcome this presumption, we conclude that HARRODS is an inherently distinctive mark and was inherently distinctive before the defendant Domain Names were registered.

■ We also find that the HARRODS trademark has acquired distinctiveness through use in commerce. A trademark possesses secondary meaning when its primary significance to the consuming public is to identify the particular business or product with which it is used. *See Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Corp.*, 148 F.3d 417, 421 (4th Cir.1998). There is significant evidence that the HARRODS trademark has acquired a secondary meaning among consumers. In particular, it is uncontested that Harrods Limited has enjoyed great commercial success in its use of the HARRODS trademark for over 150 years to sell the products and services discussed *supra*.[17] We therefore conclude that the HARRODS

---

17. Defendants' arguments that the connection of Princess Diana with the son of Mohamed al Fayed, plaintiff's owner, and the plaintiff's loss of certain Royal Warrants have destroyed

trademark is "distinctive" within the meaning of Section 43(d)(2) of the Lanham Act.[18]

### D. *Bad Faith Intent to Profit*

 Having considered all nine of the statutory factors, we find, for the reasons discussed below, that the defendants prevail on Factors I, II, and VII; plaintiff prevails on Factors III, V, VI, VIII, and IX; and Factor IV is inapplicable.

#### 1. *Factor I: HBAL's trademark and intellectual property rights*

As noted above, HBAL owns registered trademarks in the name "HARRODS" in Argentina, Paraguay, Uruguay, Brazil, Chile, Bolivia, Peru, and Venezuela. According to Raul Drelichman,[19] HBAL owns over one hundred trademarks in Argentina, and at least one, but often several, in every other South American country. *See* Tr. at 692. Among these trademarks are the word "HARRODS" standing alone, as well as in combinations including: "HARRODS DEPARTMENT STORE," "HARRODS SIRVE AL MUNDO," "HARRODS MAGAZINE," "HARRODS PARKING SHOP," and "HARRODSCARD." *See* DEX 50. In Argentina, HBAL possesses trademarks in the name "HARRODS" for every classification of goods recognized by the World Intellectual Property Organization's International Classification of Goods and Services for the Purposes of the Registration of Marks. *See id.*

HBAL admits that it has no intellectual property rights in the United States. It

---

or otherwise tarnished the distinctiveness of the HARRODS mark are meritless. There is simply no evidence in this record of any diminution in plaintiff's business since those events.

**18.** Having found the HARRODS mark distinctive, we need not consider whether it is famous. However, for purposes of completeness, we will briefly address this issue. Whether a trademark is "famous" under Section 43(d) of the Lanham Act is determined under the criteria listed in 15 U.S.C.A. § 1125(c)(1) (1998). Considering these factors, we find that the HARRODS mark is famous based on: plaintiff's use of the mark over 150 years; its ownership of three incontestable United States trademark registrations for the HARRODS mark; the use of that mark throughout the United States and worldwide in various channels of trade for diverse product lines; and the extensive publicity associated with the mark. *See, e.g., Teletech Customer Care Mgt. (Ca.), Inc. v. Tele-Tech Co.*, 977 F.Supp. 1407, 1413 (C.D.Ca.1997) (finding mark famous based on Section 43(c) factors). Moreover, the HARRODS mark was famous before the defendant Domain Names were registered.

The report and testimony of plaintiff's expert, Dr. Gerald L. Ford, who specializes in commercial marketing and surveys related to trademark cases, supports this finding. Dr. Ford concluded that the HARRODS trademark is known to approximately fifty-three percent of the Internet users who would be exposed to the defendant Domain Names and fifty-seven percent of the international travelers who would be exposed to the HARRODS trademark. *See* 4 J.T. MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 24:92, at 24–169 (2001 ed.) (trademark may be characterized as famous if it is known to more than fifty percent of the defendant's potential customers). More importantly, Dr. Ford's survey also shows that the HARRODS trademark is known to approximately forty-five percent of the United States public as a whole. *See Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Utah Div. of Travel Dev.*, 955 F.Supp. 605, 613 n. 4 (E.D.Va.1997), *aff'd*, 170 F.3d 449 (4th Cir.1999) (survey showing that over forty percent of United States general public recognized trademark supported conclusion that the mark was famous).

**19.** Drelichman's role in HBAL is unclear. He testified that he does not work for HBAL. Instead, he works for Gibertoni and is paid by several of Gibertoni's other companies. Although the source of his income and the scope of his responsibilities are confusing, Drelichman appears to be intimately familiar with HBAL's business dealings. *See* Tr. at 500–02.

has no United States trademark registrations, *see* PEX 24, at 6 and 8, and it has no common law rights because it has not, within at least the last ten years, offered any goods or services in commerce in the United States. *See* PEX 34, at 1–2; PEX 59, at 81. The ACPA, however, does not limit consideration solely to those trademarks conferred by the United States. *See* 15 U.S.C.A. § 1125(d)(B)(i)(I) (West Supp.2000). Although HBAL holds no United States trademarks, it does own several South American trademarks. Therefore, Factor I favors the defendants.

### 2. *Factor II: The domain names and HBAL's legal name*

Factor II directs determination of whether, and to what extent, the domain names at issue consist of "the legal name of the person or a name that is otherwise commonly used to identify that person." 15 U.S.C.A. § 1125(d)(B)(i)(II) (West Supp.2000). Plaintiff argues that HBAL's incorporation of the word "Harrods" in each of the defendant Domain Names reflects HBAL's bad faith because HBAL's legal name is Harrods (Buenos Aires) Limited. We reject plaintiff's argument for two reasons. First, the English courts held that HBAL has an "irrevocable" right to "carry on business under the name *Har-*

*rods* anywhere in South America." *Harrods II,* 1999 F.S.R. at 193 (emphasis added). Second, Factor II permits a court to consider a "commonly used" name. It is beyond dispute that HBAL is commonly referred to as Harrods in South America. *See Hartog v. SWIX.com,* 136 F.Supp.2d 531, 540 (E.D.Va.2001) (Jones, J., by consent) (noting that an absence of bad faith may be found where a registrant uses only part of its legal name in registering a domain name). Thus, Factor II also falls in defendants' favor.

### 3. *Factor III: HBAL's prior use of the domain names*

Under Factor III a court should consider a registrant's prior use of the domain name in connection with the *bona fide* offering of goods and services online. Congress envisioned that a court should find no bad faith if there had been "legitimate use of the domain name in online commerce." S. Rep. 106–140, at 10 (1999).

The evidence clearly establishes that no goods or services have been offered through any of the defendant Domain Names. Instead, each website uniformly

consists of a first page displaying HBAL's logo and HBAL's contact information.[20] If a user "clicks" on HBAL's logo a new page appears which shows: pictures of the Buenos Aires store; HBAL's logo; the phrase "The Traditional Buenos Aires Store Soon on the Internet," listed in both English and Spanish; a link for "Investors and partners relationships" [sic]; and links for

20.

Harrods (Buenos Aires) Ltd.
Florida 877 - (1005) Ciudad de Buenos Aires - Argentina
Te. (+54-11) 4322-8813 / 8740 / 9104
Fax (+54-11) 4328-4034 / 4031
info@harrodsbuenosaires.com

"Noticias sobre Harrods—La Nación— Reuters—Harrods in the Press." [21] The

21.

LA TRADICIONAL TIENDA DE BUENOS AIRES
PRONTO EN INTERNET

The TRADITIONAL BUENOS AIRES STORE
SOON ON THE INTERNET

Investors and partners relationships
Noticias sobre Harrods - La Nación - Reuters - Harrods in the Press

Harrods (Buenos Aires) Ltd.
Florida 877 - (1005) Ciudad de Buenos Aires - Argentina
Tel. (+54-11) 4322-8813 / 8740 / 9104
Fax (+54-11) 4328-4034 / 4031
info@harrodsbuenosaires.com

"Investors" link merely takes a user to a form requesting contact information.[22] The "Harrods in the Press" links take the user to two articles regarding HBAL's registration of the defendant Domain Names. Because HBAL has not offered any goods or services online at any of the defendant Domain Names, plaintiff prevails on Factor III.

### 4. *Factor IV: HBAL's bona fide non-commerical or fair use*

To ensure that speech protected by the First Amendment is not jeopardized by the ACPA, a court should consider a registrant's "legitimate noncommercial or fair use of the mark in a website that is accessible under the domain name at issue." 15 U.S.C.A. § 1125(d)(B)(i)(IV) (West Supp. 2000). Congress envisioned that "the in-terests of trademark owners" would be balanced with the interests of registrants engaged in "comparative advertising, comment, criticism, parody, news reporting, etc." S. Rep. 106–140, at 10 (1999). Because HBAL registered the Domain Names for commercial purposes, this non-exclusive factor is inapplicable to the facts here.

### 5. *Factor V: HBAL's Intent to Divert Customers*

Factor V directs consideration of whether HBAL, for its own commercial gain, intended to create a likelihood of confusion and thus divert potential customers from plaintiff's Internet presence to the defendant Domain Names. For the reasons that follow, we find that the evidence overwhelmingly shows HBAL intended to divert plaintiff's customers.

22.

First, HBAL has admitted that it registered nearly 300 domain names incorporating the name "Harrods." [23] Many of these names incorporate goods or services that HBAL either has never offered, or has not offered for at least five years. [24] For example, HBAL has registered domain names suggesting it intended to offer services or goods consisting of: banking services, [25] toys and games, [26] computers, [27] insurance, [28] travel services, [29] health services, [30] groceries, [31] entertainment services, [32] classifieds services, [33] casinos, [34] compact discs, [35] televisions, [36] telephones, [37] modes of transportation, [38] electronics, [39] films, [40] wines, [41] sports, [42] camping, [43] books, [44] auctions, [45] pictures, [46] real estate, [47] and music. [48] Whereas HBAL presently provides no such goods and services, Harrods Limited actively provides almost all the goods and services for which HBAL registered a domain name. [49] Therefore, we find that the defendant Domain Names closely and deliberately replicate goods and services offered by Harrods Limited or its affiliates.

Second, with very few exceptions, HBAL joined English words such as

23. Although many of the domain names are not at issue in this litigation, HBAL's other registrations are relevant because of the sheer number of registrations and the range of goods and services connected to those domain names.

24. The ACPA does not require that a registrant must have previously engaged in the provision of goods or services it intends to offer through a domain name. However, a fine line exists between pipe dreams and bad faith intent to profit in registering a panoply of domain names.

25. With limited exceptions, HBAL has registered the domain names in Footnotes 25 through 48 in each of the three generic top-level domains (.com, .org, and .net), and sometimes in the .com.ar domain: harrodsbank, harrodsbanking, harrodsfinancial, harrodsconsulting, harrodsbrokers, harrodsinvestments, harrodsfunds, harrodsmutual, and harrodsloans.

26. harrodstoys and harrodsgames.

27. harrodscomputer, harrodscomputers, harrodscomputadoras, harrodssystems, and harrodspc.

28. harrodsinsurance.

29. harrodstravel, harrodshotel, and hotelharrods.

30. harrodshealth.

31. harrodsgroceries, harrodssupermarket, marketharrods, and harrodsmarket.

32. harrodsentertainment.

33. harrodsclassified and harrodsclasified.

34. harrodscasino and casinoharrods.

35. harrodscd.

36. harrodstv.

37. harrodstelephone.

38. harrodstrucks, harrodsairplanes, harrodscars, and harrodsairline.

39. harrodselectronics.

40. harrodscinema, harrodsvideo, harrodsfilms, and harrodsmovies.

41. harrodswines.

42. harrodssports.

43. harrodscamping.

44. harrodsbooks and harrodsbookstore.

45. harrodsauctions.

46. harrodspictures.

47. harrodsrealestate.

48. harrodsmusic.

49. Curiously, HBAL has not registered any domain names associated with parking garages, the only service it currently offers.

"bank," "banking," "financial," "services," "virtual," "store," and "shopping" with the HARRODS mark. HBAL's use of English words is highly suspect because neither Gibertoni nor Drelichman claims to speak English. Furthermore, HBAL, by its own admission and through the decisions of the English courts, is not authorized to use the name "Harrods" in commerce outside of South America.

Third, the initial business proposal for use of the Domain Names, though ultimately rejected by HBAL, is instructive. The proposal, which was developed in late December 1999, before this litigation commenced but after the registration of the Domain Names, is strong evidence of HBAL's intent to divert plaintiff's custom-

ers. The logo on the cover of the proposal and on the corner of each page closely resembles the plaintiff's logo and differs substantially from the logo used by HBAL for the past twenty-five years.[50] The proposal, which includes references to HBAL's "British flavor" and its "British inheritance and origin," contemplates use of the Domain Names and HBAL's name and logo in a virtual shopping mall, or a "hub." A proposed webpage, which would be accessible through the defendant Domain Names, includes a scripted "Harrods" logo nearly identical to the plaintiff's logo, and depicts a British citizen using HBAL's website to purchase goods from Burberrys (a renowned British brand)

**50.** Compare the logo used throughout the business proposal with plaintiff's logo in Footnote 5.

BUENOS AIRES

with funds from Barclays (a British bank).[51] Moreover, the document refers to worldwide consumers. *See* PEX 4, at 0128. Finally, the business proposal recognizes the potential for "customer[s'] confusion with London based Harrods." *Id.* As the Fourth Circuit has found, a registrant's awareness that a domain name may be confused with another's mark is evidence of the registrant's bad faith. *Virtual Works,* 238 F.3d at 269. For all these reasons, plaintiff prevails on this factor.

### 6. *Factor VI: Offers to Sell the Domain Names*

Under Factor VI, a registrant's offer to sell the defendant Domain Names or the registrant's "prior conduct indicating a pattern of such conduct" may indicate bad

faith. 15 U.S.C.A. § 1125(d)(1)(B)(i)(VI) (West Supp.2000). Although there is no evidence suggesting that HBAL offered to sell or transfer any of the defendant Domain Names, HBAL has offered to sell to plaintiff all its trademarks and other rights. The history of HBAL's efforts to sell its business supports plaintiff's argument that HBAL's registration of the Domain Names was intended to "drive up the price [HBAL] can command from [plaintiff] for the sale of [the "Harrods"] name." Pl. Post–Trial Brief at 15.

The history of the sales negotiations between the parties supports the conclusion that HBAL acted with a bad faith intent to profit in registering the defendant Domain Names. For example, in 1994, while HBAL's store was still open, although deteriorating, HBAL rejected plaintiff's $10

51.

million offer, and instead demanded $200 million. Gibertoni's explanation that this figure accounted for Argentinian inflation is incredible. These past negotiations support an inference that at least part of Gibertoni's motivation in registering the defendant Domain Names was to reserve for the future the possibility of ratcheting up HBAL's value, especially in light of Gibertoni's statement that HBAL's greatest asset is its name. *See* Tr. at 423. Factor VI therefore weighs in Harrods Limited's favor.

7. *Factor VII: HBAL's contact information*

The parties have stipulated that HBAL never provided false or misleading contact information in registering any of the defendant Domain Names. *See* Tr. at 684–85. This factor therefore weighs in defendants' favor.

8. *Factor VIII: The multiplicity of HBAL's domain name registrations*

It is undisputed that HBAL has not registered any domain names incorporating any marks other than HARRODS. Therefore, to the extent that Factor VIII instructs a court to look to the multiplicity of trademarks that a registrant has incorporated into its domain names, Factor VIII weighs in defendants' favor. However, Factor VIII also addresses whether a registrant is engaging in the practice of "warehousing" by registering multiple domain names that "mirror the trademarks of others" without offering to sell goods and services at those domain names. *See* S. Rep. 106–140, at 11 (1999).

HBAL argues that when it registered the defendant Domain Names it relied heavily on the English court decisions declaring that it has an irrevocable right to use the HARRODS mark. However, as previously discussed, those decisions limit HBAL's use of the HARRODS mark to South America. Therefore, those decisions do not give HBAL rights to engage in business using the HARRODS mark in the United States or elsewhere. Given HBAL's initial business proposal and its registration of several domain names in English rather than Spanish, we find that HBAL registered the defendant Domain Names intending to use them outside of South America. Having trademark rights only in South America, HBAL's registrations of these Domain Names in the United States amount to registrations of "others' marks."

Because HBAL's actions constitute registrations of "others' marks," we must decide whether the defendant Domain Names are either identical or confusingly similar to plaintiff's distinctive mark. *See* Discussion, *supra* at § II(C). We find that plaintiff has established that the defendant Domain Names are "confusingly similar" to the HARRODS trademark because the names bear a visual resemblance to the HARRODS mark such that consumers might think that they were used, approved, or permitted by Harrods Limited. *See Sporty's Farm, supra,* 202 F.3d at 497 (finding sportys.com confusingly similar to distinctive trademark "SPORTY'S" and noting that "confusingly similar" standard is different from traditional "likelihood of confusion" test); *see also Northern Light Technology, Inc. v. Northern Lights Club,* 97 F.Supp.2d 96, 117 (D.Mass.2000), *aff'd,* 236 F.3d 57 (1st Cir.2001) ("Congress intended simply a comparison of the mark and the allegedly offensive domain name" to determine whether a domain name is confusingly similar to a distinctive trademark).

All eighteen second-level domain names at issue combine the distinctive HARRODS trademark with other generic or geographic terms in English or Spanish.

HBAL's use of such qualifiers does not diminish the similarity of the defendant Domain Names to the HARRODS mark. *See, e.g., Anti–Defamation League of B'Nai B'Rith v. National Mexican American Anti–Defamation Comm., Inc.,* 510 F.2d 1246, 1247 (D.C.Cir.1975) (addition of qualifying words "National Mexican American" to plaintiff's "ANTI–DEFAMATION COMMITTEE" trademark did not make confusion between marks unlikely); *Kentucky Fried Chicken Corp. v. Smith,* 351 F.Supp. 1311, 1313 (E.D.Mich.1972) (Al's Kentucky Fried Chicken was likely to be confused with KENTUCKY FRIED CHICKEN trademark); Steven R. Borgman, *The New Federal Cybersquatting Laws,* 8 Tex. Intell. Prop. L.J. 265, 266 (2000) (noting that among the various forms of cybersquatting is the registration of "another's mark or name as part of a domain name, such as 'dellspareparts.com' for a business selling spare parts for Dell computers"); Adam Silberlight, Comment, *www.How to Be a Master of Your Domain.com: A Look at the Assignment of Internet Domain Names under Federal Trademark Laws, Federal Case Law and Beyond,* 10 ALB. L.J. SCI. & TECH. 229, 263 (2000) ("Once a term is trademarked, others are prevented from changing its terminology to use that same term in combination with another term that denotes a distinguishable locality."). A visual comparison of each of the defendant Domain Names with the HARRODS trademark leads to the indisputable conclusion that the Domain Names are confusingly similar to plaintiff's mark and a website user would reasonably assume that the qualifier added to the HARRODS mark was one added by Harrods Limited, the trademark holder.

The report and testimony of George Mantis, plaintiff's expert in the field of consumer market research regarding trademark matters, reinforces this conclusion. Mantis designed and conducted a survey to determine whether and to what extent individuals would likely believe that the Domain Name "harrodssouthamerica.com" is used or approved by Harrods Limited. *See* Tr. at 348–49. Between approximately twenty-three and thirty-one percent of those surveyed believed that "harrodssouthamerica.com" was used, approved, or permitted by Harrods Limited. *See Sara Lee Corp. v. Kayser–Roth Corp.,* 81 F.3d 455, 467 (4th Cir.1996) (noting that survey evidence above ten percent is sufficient to show confusion); *Teaching Co., L.P. v. Unapix Entertainment, Inc.,* 87 F.Supp.2d 567, 583–84 (E.D.Va.2000) (survey showing that sixteen percent of respondents were confused supported finding of likelihood of confusion). Mantis' survey therefore confirms that the defendant Domain Names are confusingly similar because there is a significant likelihood of confusion between plaintiff's HARRODS mark and defendant harrodssouthamerica.com.[52] HBAL offered no expert to counter Mantis' conclusions. Accordingly, Factor VIII weighs heavily in plaintiff's favor because each of the defendant Domain Names is confusingly similar to the HARRODS trademark.

### 9. *Factor IX: The Famousness or Distinctiveness of Plaintiff's Mark*

We have previously concluded that the HARRODS mark is both distinctive and

---

**52.** Defendants argues that Mantis' testimony would, at best, support a finding of likelihood of confusion only as to "harrodssouthamerica.com." We reject defendants' argument. This study clearly demonstrates that if other defendant Domain Names had been tested, a similar, if not identical, rate of confusion would have been found given that the only differences between the various defendants is the use of different words alongside the HARRODS trademark.

famous. *See* Discussion, *supra*, § II(C). Plaintiff's protected mark compels a finding in its favor on Factor IX.

Having considered all nine of the statutory factors, we conclude that plaintiff has established by a preponderance of the evidence that the defendant Domain Names were registered with a bad faith intent to profit.[53]

### E. *The ACPA's Safe Harbor*

HBAL's remaining argument is that its actions fell within the ACPA's "Safe Harbor." As noted *supra*, § II(A), the Safe Harbor provides that no liability will be found if a court "determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C.A. § 1125(d)(1)(B)(ii) (West Supp. 2000). However, the Fourth Circuit, in *Virtual Works, Inc. v. Volkswagen of America, Inc.*, 238 F.3d 264, 270 (4th Cir. 2001), explained:

> All but the most blatant cybersquatters will be able to put forth at least some lawful motives for their behavior. To hold that all such individuals may qualify for the safe harbor would frustrate Congress' purpose by artificially limiting the statute's reach. We do not think Congress intended the safe harbor to protect defendants operating, at least in part, with unlawful intent.

HBAL invokes the Safe Harbor based on: the English courts' decisions which established HBAL's irrevocable right to use "Harrods"; its possession of multiple trademark registrations in South America for "HARRODS"; its several-decade history of providing goods and services under the name "Harrods"; and plaintiff's offer to purchase HBAL's rights to the name

"Harrods." Defendants also point to Gibertoni's explanations as to his business plans for HBAL and why he registered the defendant Domain Names.

We find HBAL's arguments unavailing. Although HBAL indisputably has rights in the name "Harrods" in South America, it exceeded those rights in registering the defendant Domain Names. Moreover, Gibertoni's testimony was inherently incredible. Lastly, the evidence of HBAL's bad faith intent to profit is overwhelming. Therefore, the Safe Harbor provides defendants no protection.

### F. *Harrods Limited's Hands are Not Unclean*

HBAL has argued throughout this litigation that Harrods Limited may not seek equitable relief because it has litigated with unclean hands. The crux of defendants' argument is that plaintiff's First Amended Complaint claimed rights in trademark registrations and applications that had been abandoned, canceled, or rejected.

A defendant may prove the affirmative defense of unclean hands only upon a showing that "plaintiff's conduct was in fact inequitable"; that "plaintiff's conduct directly related to the claim which it has asserted against defendant"; and that "plaintiff's conduct injured defendant." *JTH Tax, Inc. v. H & R Block Eastern Tax Services, Inc.*, 128 F.Supp.2d 926, 949 (E.D.Va.2001). The doctrine of unclean hands is inapplicable here because HBAL has not shown how plaintiff's inclusion of invalid trademarks in its First Amended Complaint injured the defendants. Moreover, the Fourth Circuit has noted that a plaintiff's unclean hands must be the result of a "willful wrongdoing in relation to the

---

**53.** Given the abundant evidence of HBAL's bad faith intent to profit, plaintiff would prevail even if the higher clear and convincing evidence standard were applied.

controversy before" the court. *Lyon v. Campbell,* 217 F.3d 839, 2000 WL 991650, at *3 (4th Cir. July 19, 2000) (unpublished decision). HBAL has not proved that the false allegations in plaintiff's first complaint were willful. Moreover, before trial plaintiff's new counsel filed a Second Amended Complaint, correcting the errors. Accordingly, defendants' affirmative defense of unclean hands is meritless.

## III. *Conclusion*

This litigation involves a factually unique situation where both parties have a legitimate right to use the same famous HARRODS mark. Before the Internet and its shrinking of geographical boundaries, the English courts' rulings seemed to resolve the problems between these parties: each could use the name "Harrods" to conduct business in different parts of the world. And before we had the benefit of this three-day trial, which allowed us to assess the credibility of witnesses against a backdrop of a fully-developed record, we had concluded that it would be consistent with the English courts' rulings to grant summary judgment for the six domain names that clearly used HBAL's name (harrodsbuenosaires) or the descriptor "Argentina" (harrodsargentina). Given the commercial importance of electronic commerce and the United States' dominance in the Internet world, banning HBAL from registering any top-level domain names in its own name in the United States struck us as inherently unfair.

However, the facts revealed at trial have changed our view as to even those six Domain Names. Given HBAL's registration of nearly 300 domain names, Gibertoni's incredible testimony, and strong evidence of HBAL's bad faith intent to profit as discussed above, we are now satisfied that plaintiff has proven by a preponderance of the evidence that all sixty of the defendant Domain Names were registered with a bad faith intent to profit. We will therefore enter judgment in plaintiff's favor as to the fifty-four domain names remaining before us. Consistent with this reasoning, if our October 6, 2000 ruling were remanded by the Fourth Circuit, we would enter judgment against the six domain names addressed in that decision for the reasons stated in this Memorandum Opinion.

An appropriate Order entering judgment in plaintiff's favor as to the fifty-four remaining defendants will issue.

The Clerk is directed to forward copies of this Memorandum Opinion to counsel of record.

## *ORDER*

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

ORDERED that judgment be and is entered in favor of plaintiff Harrods Limited; and it is further

ORDERED that under 15 U.S.C.A. § 1125(d)(2)(D), Network Solutions, Inc. transfer to plaintiff within eleven days the defendant Domain Names: harrodssudamerica.com, harrodssudamerica.net, harrodssudamerica.org, harrodssouthamerica.com, harrodssouthamerica.net, harrodssouthamerica.org, harrodsbrasil.com, harrodsbrasil.net, harrodsbrasil.org, harrodsbrazil.com, harrodsbrazil.net, harrodsbrazil.org, ciberharrods.com, ciberharrods.net, ciberharrods.org, cyberharrods.com, cyberharrods.net, cyberharrods.org, harrodsbank.com, harrodsbank.net, harrodsbank.org, harrodsbanking.com, harrodsbanking.net, harrodsbanking.org, harrodsfinancial.com, harrodsfinancial.net, harrodsfinancial.org, harrodsservices.com, harrodsservices.net, harrodsservices.org, harrodsvirtual.com, harrodsvirtual.net,

harrodsvirtual.org, harrodsstore.com, harrodsstore.net, harrodsstore.org, tiendaharrods.com, tiendaharrods.net, tiendaharrods.org, harrodsamerica.com, harrodsamerica.net, harrodsamerica.org, shoppingharrods.com, shoppingharrods.net, shoppingharrods.org, harrodsshopping.com, harrodsshopping.net, harrodsshopping.org, harrodsbashopping.com, harrodsbashopping.net, harrodsbashopping.org, harrodsshoppingba.com, harrodsshoppingba.net, and harrodsshoppingba.org; and it is further

ORDERED that Plaintiff's Exhibit 4 and all trial testimony concerning that exhibit be UNSEALED.

The Clerk is directed to enter judgment in favor of plaintiff Harrods Limited pursuant to Fed.R.Civ.P. 58, unseal Plaintiff's Exhibit 4 and corresponding trial testimony, and forward copies of this Order to counsel of record and Network Solutions, Inc., 505 Huntmar Park Drive, Herndon, VA 20170.