**GREAT EASTERN RESORT CORPORATION**
Plaintiff,

v.

**VIRTUAL RESORT SOLUTIONS, L.L.C and Keith Arnold**
Defendants.

No. CIV.A.5:01CV00039.

United States District Court,
W.D. Virginia,
Harrisonburg Division.

March 14, 2002.

LeAnn M. Buntrock, Dana R. Cormier, Thomas E. Ullrich, Wharton, Aldhizer & Weaver, PLC, Harrisonburg, VA, for Plaintiff.

Neal L. Walters, Scott & Kroner, P.C., Charlottesville, VA, for Defendants.

## MEMORANDUM OPINION

MICHAEL, Senior District Judge.

The Plaintiff, Great Eastern Resort Corporation ("Great Eastern"), filed suit against the defendants, Keith Arnold ("Arnold") and Virtual Resort Solutions ("VRS"), on May 8, 2001, invoking federal jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(b), and 1367.[1] On November 29, 2001, the court heard arguments from counsel on the plaintiff's motion for a preliminary injunction. Prior to the hearing date, the court received the parties' memoranda and supporting affidavits. Both parties, as directed by the court, filed additional post-hearing memoranda. Having thoroughly considered the issue, the court finds that a preliminary injunction is appropriate in this case, and thus, grants the plaintiff's motion.

### I.

Since 1984, Great Eastern has developed and sold timeshare units and offered

---

1. 28 U.S.C. § 1331 grants original jurisdiction to federal district courts for civil actions arising under the laws of the United States. This action arises under the Lanham Act, 15 U.S.C. § 1125. § 1338(b) grants original jurisdiction to federal district courts for claims of unfair competition when joined with a substantial and related claim under trademark law. § 1367 grants federal district courts supplemental jurisdiction over state claims related to claims in the same case or controversy where the court has original jurisdiction.

recreational facilities under the names "Massanutten" and "Massanutten Resorts." Massanutten Ski Resort, which Great Eastern's property now encompasses, has been in operation since approximately 1969. The resort is located in Rockingham County, Virginia in the Shenandoah Valley. During the course of its ownership, Great Eastern has spent a substantial sum marketing the resort and its facilities throughout the world.

In 1995, Arnold formed Massanutten Tour Company ("MTC") and began offering tours and services to resort and area guests. Arnold registered the company with the State Corporation Commission and later registered the domain names *massanutten.com, emassanutten.com, massanuttenvacations.com,* and *massanuttenresort.com.* Subsequently, Great Eastern registered a website under the domain name *massresort.com* to promote Massanutten Resort. In 1996, Arnold entered into an exclusive contractual relationship with Great Eastern to provide bus tour services for Massanutten Resort. Great Eastern promoted this exclusive relationship in material provided to resort guests and with a hyperlink between the MTC and Massanutten Resort websites. In 1997, after the relationship between Great Eastern and Arnold/MTC had begun to deteriorate, Great Eastern terminated the exclusive relationship but continued to use MTC's services on an as needed basis until 2000.

In 2000 Arnold formed VRS to advertise timeshare units for sale in Massanutten Resort. VRS took over the *massanutten.com* website and related domain names from MTC. The website offers information about accommodations, timeshares, sports, crafts, kids' activities, virtual tours, site maps, childcare and other amenities related to Massanutten Resort. While Great Eastern's website, *massresort.com,* states that it is "[t]he Official Website of Massa-

nutten Resort," the defendants' website announces that it is "[y]our online resource for Massanutten Resort info." The defendants website also displays the slogan, "Quite possibly Virginia's finest four season resort" and uses the heading "Massanutten Resort" on each page of the site.

The plaintiff claims that the defendants' aforementioned domain names and use of the terms "Massanutten" and "Massanutten Resort" on the VRS website violate the Lanham Act, 15 U.S.C. § 1125, the Anticybersquatting Consumer Protection Act (ACPA), 15 U.S.C. § 1125(a)(1)(B)(i), and supplemental state law claims of unfair competition and tortious interference with business expectancy. The plaintiff seeks a preliminary injunction enjoining defendants from using the terms "Massanutten" and "Massanutten Resort" on their website, "massanutten.com," and from using the various domain names that access that website.

## II.

### A. Standard for Awarding Preliminary Injunctions

The Fourth Circuit has recognized that "preliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.,* 245 F.3d 335, 339 (4th Cir.2001) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.,* 952 F.2d 802, 816 (4th Cir.1991) (internal quotation marks omitted)). A party seeking preliminary injunctive relief faces the significant burden of clearly establishing entitlement to the relief sought. *See Hughes Network Systems v. InterDigital Communications Corp.,* 17 F.3d 691, 693 (4th Cir.1994). Injunctive relief granted early in the course of litigation should indeed be the exception rather than the rule. As the Fourth Circuit has

expressed, the hazard of granting a preliminary injunction is that it "requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting in a certain way. '[T]he danger of a mistake' in this setting 'is substantial.'" *Hughes,* 17 F.3d at 693 (quoting *Federal Leasing, Inc. v. Underwriters at Lloyd's,* 650 F.2d 495, 499 (4th Cir.1981)).

### B. Four Factors and Balancing Test

■ A grant of preliminary injunctive relief requires a balancing of the four factors established in *Blackwelder Furniture Co. v. Seilig Manufacturing Co.,* 550 F.2d 189, 195–96 (4th Cir.1977):(1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; (2) the likelihood of harm to the defendant if the request is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest. The Fourth Circuit recognizes the "balance of hardships" between the plaintiff and defendant as the most important consideration among the four factors as it determines whether the plaintiff must show a substantial likelihood of success on the merits. *Hughes,* 17 F.3d at 693 (citing *Blackwelder,* 550 F.2d at 196). "If the plaintiff[ ] fail[s] to establish that the balance of hardships tips in its favor, an injunction should only be granted if the plaintiff establishes a 'substantial likelihood of success' on the merits." *Yellow Cab Co. of Charlottesville v. Rocha,* No.Civ.A. 3:00CV00013, 2000 WL 1130621, at *3 (W.D.Va. July 5, 2000) (citing *Direx Israel, Ltd. v. Breakthrough Med. Corp.,* 952 F.2d 802, 818 (4th Cir. 1991).

### 1. Balance of Hardships

■ The plaintiff argues that a *prima facie* showing of trademark infringement raises both a presumption of irreparable harm and a likelihood of success. (Pl.'s Mem. Supp. Prelim. Inj. at 10). In fact, the Fourth Circuit has recognized that a district court is "entitled" to presume a likelihood of success on the merits and irreparable harm when the plaintiff makes a *prima facie* showing of infringement. *Service & Training Inc. v. Data General Corp.,* 963 F.2d 680, 690. However, the defendant argues that the plaintiff's delay in bringing the present action directly contradicts an allegation of irreparable injury. (Defs.' Resp. to Pl.'s Mot. for Prelim. Inj. at 10). The Second Circuit held in *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 276 (2d Cir.1985) that a "[s]ignificant delay in applying for injunctive relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial...." Because a presumption may not be dispositive in light of evidence to the contrary, this court will exercise its entitled discretion to evaluate independently the balance of hardships relative to each party before weighing the *Blackwelder* factors together.

The plaintiff alleges that the defendants have caused it irreparable harm by "intentional[ly] infring[ing] upon the "Massanutten" and "Massanutten Resort" marks,...diver[ting]...customers to Defendants' website, and...interfer[ing] with Great Eastern's existing business and prospective business relationships." (Pl.'s Mem. Supp. Prelim. Inj. at 28). The plaintiff argues that the defendants' activities have eroded Great Eastern's goodwill and reputation. *Id.* Specifically, Great Eastern asserts that the domain name used by the defendants identifies a specific company, "Massanutten," and users are likely to surmise that Great Eastern and the owner of the website are the same entity. (Pl.'s Post Hr'g Mem. Supp. Prelim. Inj. at 41). In fact, the plaintiff maintains that defendant Arnold admitted in testimony that "Massanutten" is the intuitive domain name for Great Eastern's Massanutten Resort. *Id.* The plaintiff claims that the defendants' continued use

of "Massanutten" and "Massanutten Resort" will result in a loss of control, and damage to, the plaintiff's reputation, *Id.* at 42, and that granting a preliminary injunction will "simply force Defendants to create their own goodwill and marketing presence." (Pl.'s Mem. Supp. Prelim. Inj. at 29). That is, the plaintiff argues that any harm to the defendants' resulting from the imposition of a preliminary injunction would be from the "[d]efendants' own failure to establish customer relationships, goodwill and market presence fairly and equitably." *Id.*

The defendants respond that enjoining the contested domain names would be the death knell for their business as they would lose all goodwill they had obtained since the business's inception. The defendants have devoted significant resources to developing their website because traffic to the site generates the majority of their income. Assuming their continued ownership and full use of the website, the defendants have entered into a joint venture with another entity and a number of short and long-term contracts with advertisers. Moreover, the defendants argue that they control such a small share of the market (three percent to Plaintiff's ninety-seven percent), that any harm suffered by the plaintiff as a result of the defendants' continued use of the domain names in issue could be compensated by an award of damages.

Based on the arguments presented, this court does not find that the balance of hardships weighs in the plaintiff's favor. The plaintiff was aware of the defendants' use of some of the domain names at issue several years before this action was filed. At the very least, the plaintiff was aware of the defendants' use of the website *massanutten.com*, with its present content, about seven months prior to filing suit. While the plaintiff claims that the defendants' use of "Massanutten" on its website

and the associated domain names erode its goodwill, the plaintiff's lack of urgency in bringing this action weakens the argument that such harm is irreparable. Also weighing in the defendants' favor is the fact that the *massanutten.com* website and related domain names represent a significant portion of their marketing strategy. While the defendants would still be able to advertise their timeshare sales through traditional means, the website represents such an important aspect of their business that this court finds that the grant of an injunction in this case would harm the defendants at least as much as a denial would harm the Plaintiff. Thus, no imbalance of hardships exists in this case.

## 2. Likelihood of Success on the Merits

■ "When, as here, the balance of hardship does not tilt decidedly in [the] plaintiff's favor then a plaintiff must demonstrate a strong showing of likelihood of success or a substantial likelihood of success by clear and convincing evidence in order to obtain relief." *MicroStrategy*, 245 F.3d at 340 (quoting *Direx*, 952 F.2d at 818 (internal quotation marks omitted)). The plaintiff's burden may be even greater in a trademark case, where the Fourth Circuit has held that the plaintiff must prove the probability, not merely the possibility, of success on the merits. *Id.* (citing *Direx*, 952 F.2d at 813) (citation omitted). Guided by this standard, the court seeks to determine whether Great Eastern has shown a substantial likelihood of success on the merits of its claims.

Great Eastern's claims against the defendants Arnold and VRS include trademark infringement pursuant to the Lanham Act, 15 U.S.C. § 1125, Virginia common law unfair competition and tortious interference with business expectancy and violation of the Anticybersquatting Consumer Protection Act

(ACPA), 15 U.S.C. § 1125(a)(1)(B)(i). Specifically, Great Eastern's claims address the defendants' use of the names "Massanutten" and "Massanutten Resort" on their website, *massanutten.com*, and the use of various domain names that access the website.

To prove a federal claim of trademark infringement/unfair competition under the Lanham Act, it is necessary to show that the plaintiff has "(1) a valid, protectable trademark and (2) a likelihood of public confusion when the mark is applied to the second user's good." *Yellow Cab*, 2000 WL 1130621, at *6 (W.D.Va. July 5, 2000) (citing *Lone Star Steakhouse and Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 930). "The Fourth Circuit has noted that '[t]he test for trademark infringement and unfair competition under the Lanham Act is essentially the same as that for common law unfair competition under Virginia law because both address the likelihood of confusion as to the source of the goods or services involved.'" *Yellow Cab*, 2000 WL 1130621, at *6 (citations omitted). The ACPA specifically provides protection for domain names identical with or confusingly similar to a protectable trademark. 15 U.S.C. § 1125(d)(1)(A). If such a mark exists, the plaintiff can get a preliminary injunction simply on the basis of his trademark infringement/unfair competition claim. For this reason, the court finds it unnecessary to address the state common law claims and the ACPA claim at this time, and thus will proceed with the merits of plaintiff's Lanham Act claims.

### a. A valid, protectable trademark

"[T]he plaintiff must first and most fundamentally prove that it has a valid and protectable mark." *MicroStrategy*, 245 F.3d at 340. Although neither the trade name "Massanutten" nor "Massanutten Resort" is federally registered to the plain-

tiff, protection of the Lanham Act extends to some unregistered marks. *See* 15 U.S.C § 1125(a). The plaintiff must prove, however, that the mark performs the job of identifying one source and distinguishing it from others. *MicroStrategy*, 245 F.3d at 341 (citing 1 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 3:3 (4th ed.2000)).

Courts recognize four basic categories of trademarks with increasing distinctiveness: 1) generic, 2) descriptive, 3) suggestive, and 4) arbitrary or fanciful. *Washington Speakers Bureau, Inc. v. Leading Authorities, Inc.*, 33 F.Supp.2d 488, 494 (E.D.Va.1999). Geographic terms, such as "Massanutten," constitute descriptive marks when they indicate the geographic source of a service or product and thus are not inherently distinctive. *See Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Corp.*, 148 F.3d 417, 421 (4th Cir. 1998). Absent proof of a secondary meaning, a descriptive mark will not receive trademark protection. *Id.* "Secondary meaning is the consuming public's understanding that the mark, when used in context, refers, not to what the descriptive word ordinarily describes, but to the particular business that the mark is meant to identify." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 125 (4th Cir.1990). A geographically descriptive word achieves a secondary meaning once the public no longer thinks of it as indicating a particular place, but rather associates it with a particular source. *Pinehurst*, 148 F.3d at 421. Thus, Great Eastern must establish that, among customers and operators within the relevant field of vacation resort real estate and related services, the name "Massanutten" is now associated specifically with Great Eastern's enterprise.

A court can consider a variety of factors and evidence to determine if a secondary meaning exists. These factors in-

clude (1) the amount and manner of advertising, (2) consumer testimony and studies, (3) the amount of sales and number of customers, (4) unsolicited media coverage, (5) proof of intentional copying of the mark, (6) and the plaintiff's length and exclusivity of use. *Perini*, 915 F.2d at 125. These factors are "relevant to, though not dispositive of, the 'secondary meaning' inquiry . . . ." *Id.*

Great Eastern presents both direct and circumstantial evidence in support of its assertion that "Massanutten" and "Massanutten Resort" have secondary meaning. The plaintiff has marketed the resort to the public under the trade names "Massanutten" and "Massanutten Resort" for over seventeen years. "[O]ver the last five years alone, Great Eastern has spent more than $135,000,000 marketing the resort under those names." (Pl.'s Post Hr'g Mem. Supp. Prelim. Inj. at 5). In addition, the plaintiff notes that it has received numerous letters addressed not to its true corporate name, Great Eastern, but rather to the names "Massanutten" and "Massanutten Resort." The plaintiff has also provided the court with copies of unsolicited media coverage that referred to the resort under the "Massanutten" trade name. The Plaintiff asserts that this evidence "tends to prove consumer association between trade name and the corporate source." (Pl.'s Post Hr'g Mem. Supp. Prelim. Inj. at 27) (quoting *Alderman v. Iditarod Properties, Inc.*, 32 P.3d 373, 384 (Alaska 2001)). Specifically, Great Eastern maintains that "Massanutten has been the singular descriptive term for the resort for thirty years," and that Arnold knew of the plaintiff's marketing efforts and use of this trade name during his ten year affiliation with the resort as a ski instructor and tour operator. (Pl.'s Post Hr'g Mem. Supp. Prelim. Inj. at 6).

The direct and circumstantial evidence presented by the plaintiff supports a finding that "Massanutten" has, in fact, developed a secondary meaning referring to the plaintiff's development. This court recognizes that the name "Massanutten" has, for many years, referred to a geographic region within Virginia. Nevertheless, the existence of such a primary meaning does not foreclose the subsequent emergence of a secondary meaning, and within the relevant field, the name "Massanutten" is now specifically associated with the plaintiff's resort.

> However, the defendants assert that the precise item in this case to which the mark, and thus secondary meaning, is alleged to attach [is] timeshares located within the Massanutten resort area of Virginia which are available for sale or rental. The question now before the court is not whether the term "Massanutten resort" identifies a particular source of skiing facilities or other accommodations, which it very well might, but rather whether the word Massanutten, or the phrase Massanutten resort, identifies Great Eastern as the unique "source" of real estate, the only commodity at issue in this case.

(Defs.' Resp. to Pl.'s Mot. for Prelim. Inj. at 15). The defendants misframe the issue. The issue is not the use of the trade names "Massanutten" and "Massanutten Resort" to identify a source of real estate or a geographic location. The issue is whether the terms have acquired secondary meaning for the plaintiff such that their use on the defendants' website suggests an association with the plaintiff's development. The plaintiff limits its claim to enjoining the use of the trade names "Massanutten" and "Massanutten Resort" on the defendants' website and in the domain names used to access that website.

Furthermore, this court is not convinced that the defendants' business, as presented on the website, is limited to the

innocuous sale of timeshares in or near the resort. The defendants' website, *massanutten.com*, also provides consumers with information regarding activities, services, accommodations, and employment opportunities offered by the plaintiff. This content is strikingly similar to that on the plaintiff's website, *massresort.com*. It also appears that the secondary meaning attached to the names "Massanutten" and "Massanutten Resort" refer not only to the skiing activities offered by the plaintiff, but to the plaintiff's entire resort, including its vacation residences.

 Even if, as the defendants suggest, this court should limit its analysis to the area of real estate, it is not clear that the application of trademark protection would be inappropriate. It is recognized that a fair use defense applies to the use of geographic terms, and thus even if a seller has established secondary meaning in a geographic mark, any individual who is located in that geographic region has a limited right to disclose his location to purchasers. 1 McCARTHY § 14:12. Nevertheless, the use of this geographic term must be limited to its descriptive sense. *Id.* That is, the fair use defense permits an individual to use the geographic term in its "primary sense," rather than its secondary meaning. *Id.* Thus, while the defendants cite some fifty entities that use the word "Massanutten" in the names of their enterprises, all of these entities use the word in its primary, descriptive sense, which is a fair use of the name. For example, entities like Massanutten Animal Clinic, Massanutten Presbyterian Church, and Massanutten Realty use the name "Massanutten" in its primary descriptive sense and thus are in no danger of being found to have infringed the plaintiff's mark. Massanutten Realty sells some property within Massanutten Resort but it can easily be distinguished from *being* the resort, or even formally associated with it. In contrast, the defendants' use of the name "Massa-

nutten" on its website, *massanutten.com*, suggests that they are, or are associated with, the plaintiff's resort itself, rather than merely the location of the real estate they advertise.

 Finally, the defendants argue that any secondary meaning attributed to the plaintiff's marks is de facto and does not give rise to a protectable trademark. The defendants claim that the plaintiff's marks are generic and in support of this assertion cite the Fourth Circuit's decision in *America Online Inc. v. AT & T Corp.*, 243 F.3d 812 (4th Cir.2001). Their reliance on this decision is misplaced. As the district court in *America Online* established, a de facto secondary meaning exists where the public associates a generic term with a single source of origin but the term, because of its generic nature, is not afforded trademark protection. *America Online v. AT & T Corp.*, 64 F.Supp.2d 549, 561. In *America Online*, the court found that the term "You Have Mail" functionally announced to online subscribers that they had mail in their electronic mailboxes. 243 F.3d at 823. "Even if a functional feature has achieved consumer recognition (secondary meaning) of that feature as an indication of origin, the feature cannot serve as a legally protectable symbol." *America Online*, 243 F.3d at 822 (quoting 1 McCARTHY § 7:66). Here, "Massanutten" and "Massanutten Resort" are geographic terms regarded as descriptive. In context, they denote source and not function. The defendants argue that the terms are generic with respect to their function as generic descriptors of where the real estate advertised on the defendants' website is located. However, as already discussed, the defendants' use of the terms "Massanutten" and "Massanutten Resort" possess a true secondary meaning indicating an association with the plaintiff's development.

### b. A likelihood of public confusion

■ After establishing that the plaintiff has a valid, protectable mark, the court must determine whether the defendants' use of the plaintiff's trademarks creates a likelihood of confusion. *See Yellow Cab*, 2000 WL 1130621, at *6. Relief under Lanham Act § 43(a) addresses use of an unregistered mark that is likely to cause confusion as to source, and, most relevant in this case, confusion as to affiliation, connection or sponsorship. 1 McCARTHY § 23:1. Thus the defendants' use of the "Massanutten" name on its website constitutes infringement if it is deemed to convey that an affiliation exists between the defendants' business and that of the plaintiff.

■ To determine whether there is a likelihood of confusion, courts generally consider a number of factors, including: (1) strength or distinctiveness of the mark, (2) the similarity of the two marks, (3) the similarity of the goods/services the marks identify, (4) the similarity of the facilities the two parties use in their businesses, (5) the similarity of the advertising used by the two parties, (6) the defendant's intent and (7) actual confusion. *Pizzeria Uno Corporation v. Temple*, 747 F.2d 1522, 1527 (4th Cir.1984).[A]ll factors may not be relevant or of equal significance. *Pinehurst*, 148 F.3d at 422. Because Great Eastern has established that the terms "Massanutten" and "Massanutten Resort" have secondary meaning, the court considers the marks to be strong. *Pinehurst*, 148 F.3d at 422. The defendants' website, *massanutten.com*, and related domain names are similar to the plaintiff's marks. In fact, the content on the defendants' website is so similar to that on the plaintiff's website that a visitor would likely assume that the defendants' site is owned or at the very least affiliated with the plaintiff. In particular, the design and content of the main page suggests that the

website is the plaintiff's. This page displays skiers in a winter resort setting and includes the quote "[q]uite possibly Virginia's finest four season resort." While the defendants claim that their business is confined to the sale and rental of timeshare units, their website, which includes information about activities, ski conditions, resort events and a map of Massanutten Resort, implies that they do much more. In fact, as both the plaintiff and the defendants have acknowledged, specific instances exist in which consumers have mistaken the defendants and the services mentioned on their website for those of the plaintiff. However, the existence of this evidence notwithstanding, there is a presumption of confusion among Internet users as a matter of law when, as the defendants have done in this case, one copies another's mark for use as a domain name. *People for Ethical Treatment of Animals, Inc. (PETA) v. Doughney*, 113 F.Supp.2d 915, 920 (E.D.Va.2000), *aff'd* 263 F.3d 359 (4th Cir.2001).

### c. Affirmative defenses

The defendants assert a number of affirmative defenses to the plaintiff's prima facie case. The analysis used to evaluate these affirmative defenses overlaps significantly with that used to determine whether a plaintiff has established a protectable mark, and to the extent such convergence occurs, further examination is unnecessary. However, the affirmative defenses of laches, acquiescence, and unclean hands deserve individual attention.

### i. Estoppel by Laches

■ "In a trademark case, courts may apply the doctrine of estoppel by laches to deny relief to a plaintiff who, though having knowledge of an infringement, has, to the detriment of the defendant, unreasonably delayed in seeking redress." *Sara*

*Lee Corp. v. Kayser–Roth Corp.*, 81 F.3d 455, 461 (4th Cir.1996) (citing 4 J. Thomas McCarthy, McCarthy On Trademarks And Unfair Competition, § 31.02 (3D ED.1995)). The plaintiff in this case was aware of the defendants' use of some of the domain names at issue several years before it filed the current action. However, it is the content currently on the defendant's website, and the related domain names, that are at the heart of the plaintiff's claim.

 While the defendants' use of the plaintiff's mark may have initially been in the context of fair use/primary meaning, the defendants at some point began utilizing the mark's secondary meaning to increase traffic to their website. It is the point at which the plaintiff became aware of the defendants' use of the mark's secondary meaning that should be relevant in determining the applicability of the doctrine of estoppel by laches to the current case. The plaintiff only became aware of the defendants' website and related domain names in their current form about seven months before filing this suit. While a seven-month delay does not denote a sense of urgency on the plaintiff's part, it in no way qualifies as an unreasonable delay. Because it appears that the defendants' prior use of the plaintiff's mark, "Massanutten Tour Company," was in its primary sense, it would have been difficult for the plaintiff to prove that such usage was inappropriate. In fact, at that time Arnold was operating Massanutten Tour Company, an affiliation existed between the plaintiff and Arnold based on their exclusive bus tour agreement. The plaintiff "has no obligation to sue until the likelihood of confusion looms large." *Sara Lee*, 81 F.3d at 462 (citations omitted). The plaintiff should also have the opportunity to, as done here, negotiate for a solution prior to bringing suit. Most importantly, the Fourth Circuit has determined that in the event that there is a likelihood

of confusion, estoppel by laches may not be invoked to deny injunctive relief. *Id.* at 461. Because the plaintiff has established that a likelihood of confusion exists, the defense of laches fails.

### ii *Acquiescence*

 Acquiescence occurs when the owner of a trademark conveys to the defendant, through affirmative word or deed, an expressed or implied consent to an infringing use of his mark. *Id.* at 462. The defendants assert that the plaintiff acquiesced in the defendants' infringing use the mark, alleging that, when Arnold inquired as to the appropriateness of naming his first business "Massanutten Tour Company," the plaintiff's general manager stated that "Massanutten" was a "generic" term. (Defs.' Resp. to Pl.'s Mot. for Prelim. Inj. at 24). Again, this court finds that the use of the term "Massanutten" in the name "Massanutten Tour Company" was a primary and fair use of the plaintiff's trademark. The usage at issue in this case, however, is the defendants' more recent reliance on the secondary meanings associated with "Massanutten" and "Massanutten Resort" in order in order to attract visitors to their website, *massanutten.com*. The defendants have not established that Great Eastern affirmatively consented to the defendants' current use of the plaintiff's marks.

### iii. *Unclean Hands*

 The affirmative defense of unclean hands applies when the plaintiff engaged in conduct related to its claim against the defendant that was inequitable and injurious to the defendant. The defendants in this case argue that the plaintiff's hands are dirtied from a "substantial and ongoing pattern of noncompliance with various state and federal requirements relating to the sale and financing of time-

shares." (Defs.' Resp. to Pl.'s Mot. for Prelim. Inj. at 25). However, the plaintiff's actions regarding the sale and financing of real estate have not been addressed in this suit. "[T]he doctrine of unclean hands applies only with respect to the right in suit. What is material is not that the plaintiff's hands are dirty, but that he dirtied them in acquiring the right he now asserts." *PETA*, 113 F.Supp.2d 915, 921. (citations omitted). As this suit concerns the use of the plaintiff's mark on a website and in domain names, not real estate, an unclean hands defense does not apply.

### 3. Public Interest

The court has addressed the plaintiff's claim under the Lanham Act which, at its core, protects the consuming public from confusion in the marketplace. The plaintiff has established that a likelihood of confusion exists and thus it is in the public's interest to enforce the Lanham Act in this case.

### III.

Having found that (1) the balance of hardships does not weigh in favor of either party, (2) the plaintiff is likely to succeed on the merits and, (2) the public interest is served by eliminating confusion in the marketplace, this court holds that Great Eastern is entitled to the relief sought, and thus the defendants shall be enjoined from using the terms "Massanutten" and "Massanutten Resort" and the related domain names in connection with their website to the extent that such use is outside the realm of fair use.

An appropriate order this day shall issue.

### ORDER

Upon consideration of the plaintiffs' November 14, 2001 "Motion for Preliminary Injunction," and for the reasons stated in the accompanying memorandum opinion, it is hereby

### ADJUDGED, ORDERED and DECREED

that:

1. The plaintiff's "Motion for Preliminary Injunction" shall be, and it hereby is, GRANTED.

2. Pending the outcome of this litigation, the defendants shall be prohibited from using the website address *massanutten.com*. The defendant shall also be prohibited from using any other website address incorporating the term "massanutten" during the period of this injunction unless given prior approval by the court.

3. Pending the outcome of this litigation, the defendants shall be prohibited from using the domain names *massanutten.com*, *emassanutten.com*, *massanuttenvacations.com*, and *massanuttenresort.com*. The defendant shall also be prohibited from using any other domain name incorporating the term "massanutten" during the period of this injunction unless given prior approval by the court.

4. The defendant is not prohibited from using the term "massanutten" in the content of its website to the extent such use qualifies as a fair use of the term's primary meaning, as more fully described in the accompanying memorandum opinion.

The Clerk of the Court hereby is directed to send a certified copy of this Order to all counsel of record.