**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

VIRTUAL WORKS, INCORPORATED,
          *Plaintiff-Appellant,*

v.

VOLKSWAGEN OF AMERICA,
INCORPORATED; VOLSWAGEN
AKTIENGESELLSCHAFT,
          *Defendants-Appellees,*

NETWORK SOLUTIONS, INCORPORATED,
          *Defendant.*

No. 00-1356

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Chief District Judge.
(CA-99-1289-A)

Argued: October 30, 2000

Decided: January 22, 2001

Before WILKINSON, Chief Judge, and MICHAEL and
TRAXLER, Circuit Judges.

---

Affirmed by published opinion. Chief Judge Wilkinson wrote the
opinion, in which Judge Michael and Judge Traxler joined.

---

### COUNSEL

**ARGUED:** William Herbert Bode, BODE & BECKMAN, L.L.P.,
Washington, D.C., for Appellant. Thomas Rex Lee, HOWARD,

PHILLIPS & ANDERSEN, P.C., Salt Lake City, Utah, for Appellees. **ON BRIEF:** Gregory D. Phillips, HOWARD, PHILLIPS & ANDERSEN, P.C., Salt Lake City, Utah; John F. Anderson, RICHARDS, MCGETTIGAN, REILLY & WEST, Alexandria, Virginia, for Appellees.

---

**OPINION**

WILKINSON, Chief Judge:

Volkswagen challenges Virtual Works, Inc.'s use of the domain name *vw.net* under the 1999 Anticybersquatting Consumer Protection Act (ACPA). Volkswagen claims that Virtual Works registered *vw.net* with the purpose of one day selling it to Volkswagen. The district court agreed, holding that Virtual Works had a bad faith intent to profit from the *vw.net* domain name and that its use of *vw.net* diluted and infringed upon the VW mark. *Virtual Works, Inc. v. Network Solutions, Inc.*, 106 F. Supp.2d 845 (E.D. Va. 2000). The district court therefore ordered Virtual Works to relinquish to Volkswagen the rights to *vw.net*. Because the district court did not err in holding that Virtual Works violated the ACPA, we affirm the judgment.

I.

On October 23, 1996, Virtual Works registered the domain name *vw.net* with Network Solutions, Inc. (NSI). At that time, NSI was the only company authorized by the government to serve as a registrar for Internet domain names. A domain name tells users where they can find a particular web page, much like a street address tells people where they can find a particular home or business. Domain names consist of two parts: the top level domain name (TLD) and secondary level domain name (SLD). The TLD is the suffix, identifying the nature of the site. The SLD is the prefix, identifying the site's owner. Thus in the domain name *Duke.edu*, ".edu" is the TLD, identifying the site as affiliated with an educational institution. "Duke" is the SLD, identifying the owner as Duke University. There are various other TLDs. The most common are *.com*, *.net*, and *.org* for commercial users and *.gov* for governmental entities. At one point there was

a distinction between the *.com*, *.org*, and *.net* TLDs. The *.net* TLD was reserved for Internet service providers (ISPs). The *.org* TLD was reserved for non-commercial or non-profit users. In September 1995, however, NSI stopped enforcing these distinctions. Thus, after 1995, commercial businesses could register domain names with the *.net*, *.org*, or *.com* TLD.

At the time Virtual Works registered *vw.net*, two of its principals, Christopher Grimes and James Anderson, were aware that some Internet users might think that *vw.net* was affiliated with Volkswagen. According to Grimes, he and Anderson "talked about Volkswagen and decided that [they] would use the domain name for [the] company, but if Volkswagen offered to work out a deal for services or products, that [they] would sell it to [Volkswagen] for a lot of money." When Virtual Works registered *vw.net*, many other domain names were available for its use. For instance, *vwi.net*, *vwi.org*, *virtualworks.net*, and *virtualworks.org*, were still available.

Virtual Works used the *vw.net* domain name for approximately two years as a part of its ISP business. In December 1998, various Volkswagen dealerships contacted Virtual Works and expressed an interest in purchasing the rights to the *vw.net* domain name. Virtual Works, in turn, called Volkswagen, offering to sell *vw.net*. The terms of Virtual Works' offer, however, were somewhat unusual. Anderson left a voice mail message for Linda Scipione in Volkswagen's trademark department. In the message, Anderson stated that he owned the rights to *vw.net*. He also said that unless Volkswagen bought the rights to *vw.net*, Virtual Works would sell the domain name to the highest bidder. Anderson gave Volkswagen twenty-four hours to respond.

In response to what it perceived as a threat to the VW mark, Volkswagen invoked NSI's dispute resolution procedure. NSI in turn told Virtual Works that Virtual Works would lose the *vw.net* domain name unless it filed a declaratory judgment action against Volkswagen. Virtual Works complied. Volkswagen subsequently counterclaimed, alleging trademark dilution, infringement, and cybersquatting under the ACPA. 15 U.S.C. § 1125(d). The district court granted Volkswagen's motion for summary judgment on its cybersquatting, dilution, and infringement counterclaims and dismissed Virtual Works' cross-motions on the same. Accordingly, the district court ordered

Virtual Works to relinquish to Volkswagen the rights to the *vw.net* domain name. Virtual Works appeals.

## II.

### A.

The ACPA was enacted in 1999 in response to concerns over the proliferation of cybersquatting — the Internet version of a land grab. According to the Senate Report accompanying the Act: "Trademark owners are facing a new form of piracy on the Internet caused by acts of 'cybersquatting,' which refers to the deliberate, bad-faith, and abusive registration of Internet domain names in violation of the rights of trademark owners." S. Rep. No. 106-140, at 4 (1999). Cybersquatting is the practice of registering "well-known brand names as Internet domain names" in order to force the rightful owners of the marks "to pay for the right to engage in electronic commerce under their own brand name." *Id.* at 5. *See also* H.R. Rep. No. 106-412, at 5-7 (1999). Cybersquatting is profitable because while it is inexpensive for a cybersquatter to register the mark of an established company as a domain name, such companies are often vulnerable to being forced into paying substantial sums to get their names back. *Sporty's Farm, L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 493 (2d Cir. 2000).

Congress viewed the practice of cybersquatting as harmful because it threatened "the continued growth and vitality of the Internet as a platform" for "communication, electronic commerce, education, entertainment, and countless other yet-to-be-determined uses." S. Rep. No. 106-140, at 8. New legislation was required to address this situation because then-current law did not expressly prohibit the act of cybersquatting and cybersquatters had started to take the necessary precautions to insulate themselves from liability under the Federal Trademark Dilution Act. *Id.* at 7. Accordingly, Congress passed, and the President signed, the ACPA in 1999. Pub. L. No. 106-113, 113 Stat. 1536 (codified at 15 U.S.C. § 1125(d)).

### B.

Under the ACPA, a person alleged to be a cybersquatter is liable to the owner of a protected mark if that person:

(i) has a bad faith intent to profit from that mark . . .; and

(ii) registers, traffics in, or uses a domain name that—

(I) in the case of a mark that is distinctive . . ., is identical or confusingly similar to that mark;

(II) in the case of a famous mark . . ., is identical or confusingly similar to or dilutive of that mark;

15 U.S.C. § 1125(d)(1)(A). With respect to the bad faith determination, the statute provides that:

(B)(i) In determining whether a person has a bad faith intent . . . a court may consider factors such as, but not limited to

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site . . . that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark . . .;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used . . . the domain name in the bona fide offering of any goods or services . . .;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name . . .;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others . . .; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous . . . .

15 U.S.C. § 1125(d)(1)(B)(i). In addition to listing these nine factors, the Act contains a safe harbor. The safe harbor provision states that bad faith intent "shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was fair use or otherwise lawful." 15 U.S.C. § 1225(d)(1)(B)(ii).

A court is not limited to considering these nine factors when determining the presence or absence of bad faith. 15 U.S.C. § 1125(d)(1)(B)(i). The Second Circuit, in the first court of appeals case addressing the ACPA, noted that the most important grounds for finding bad faith "are the unique circumstances of th[e] case, which do not fit neatly into the specific factors enumerated by Congress but may nevertheless be considered under the statute." *Sporty's Farm*, 202 F.3d at 499.

The remedies available under the ACPA depend on when the unlawful activity took place. A person who unlawfully registers, traffics in, or uses a domain name after the ACPA's date of enactment, November 29, 1999, can be liable for monetary damages under 15 U.S.C. § 1117(d) and can have the domain name transferred to the owner of the mark or canceled under 15 U.S.C. § 1125(d)(2)(D)(i). The only remedy available for ACPA violations that occurred before November 29, 1999, however, is to have the domain name transferred to the owner of the mark or canceled. Anticybersquatting Consumer Protection Act, Pub. L. No. 106-113, § 3010, 113 Stat. 1536. Since Virtual Works' alleged cybersquatting occurred before the ACPA's

date of enactment, Volkswagen sought only the right to use *vw.net* for itself.

### III.

Having discussed the statutory purpose and framework of the ACPA, we must now determine whether Virtual Works violated the Act. The district court found that a number of the ACPA's nine bad faith factors supported Volkswagen's claim that Virtual Works' registration of *vw.net* constituted cybersquatting under the Act. *Virtual Works*, 106 F. Supp.2d at 848. With respect to the first and second factors, for example, the district court held that Virtual Works had no right to or interest in the VW mark and that Virtual Works had never been referred to or done business under the name VW. *Id.* at 847. With respect to the fifth factor, the district court held that the disparaging comments posted by Virtual Works harmed the goodwill of the VW mark. *Id.* Finally, the district court found that, under the ninth factor, the famousness of the VW mark also favored Volkswagen. *Id.* The district court thus granted summary judgment to Volkswagen, which we review de novo.

### A.

The first inquiry under the ACPA is whether Virtual Works acted with a bad faith intent to profit from a protected mark. 15 U.S.C. § 1125(d)(1)(A)(i). Virtual Works claims that the district court erred in holding that it did. We need not, however, march through the nine factors seriatim because the ACPA itself notes that use of the listed criteria is permissive. As the Second Circuit noted in *Sporty's Farms*, the factors are "expressly described as indicia that 'may' be considered along with other facts." 202 F.3d at 498 (citing 15 U.S.C. § 1125(d)(1)(B)(i)).

We are mindful that the instant case comes to us on summary judgment and involves a contested determination of Virtual Works' intent. Unfortunately for Virtual Works, however, there is both circumstantial and direct evidence establishing bad faith. The following uncontested facts all provide circumstantial evidence of Virtual Works' bad faith with respect to the VW mark: 1) the famousness of the VW mark; 2) the similarity of *vw.net* to the VW mark; 3) the admission

that Virtual Works never once did business as VW nor identified itself as such; and 4) the availability of *vwi.org* and *vwi.net* at the time Virtual Works registered *vw.net*. Notably, either of these domain names would have satisfied Virtual Works' own stated criterion of registering a domain name that used only two or three letters and would have eliminated any risk of confusion with respect to the VW mark.

We consider such circumstantial factors cautiously, however. We do not suggest that these four facts would alone resolve the question of Virtual Works' intent on summary judgment. The fact that a domain resembles a famous trademark, for example, hardly in and of itself establishes bad faith. Moreover, domain names that are abbreviations of a company's formal name are quite common. To view the use of such names as tantamount to bad faith would chill Internet entrepreneurship with the prospect of endless litigation.

Volkswagen, however, points to direct evidence regarding Virtual Works' intent — the statements made at registration. Grimes' deposition reveals that when registering *vw.net*, he and Anderson specifically acknowledged that *vw.net* might be confused with Volkswagen by some Internet users. They nevertheless decided to register the address for their own use, but left open the possibility of one day selling the site to Volkswagen "for a lot of money." Volkswagen claims that this is sufficient to establish bad faith registration in violation of the ACPA.

Viewing the facts in the light most favorable to Virtual Works, as we must on summary judgment, the statement at registration establishes that Virtual Works had a dual purpose in selecting *vw.net*. Contrary to Virtual Works' claim, the fact that it used *vw.net* for two years as a part of an ISP business is not dispositive of the question of intent. Virtual Works chose *vw.net* over other domain names not just because "vw" reflected the company's own initials, but also because it foresaw the ability to profit from the natural association of *vw.net* with the VW mark. Indeed, it is obvious even to a casual observer that the similarity between *vw.net* and the VW mark is overwhelming.

Moreover, the facts in the summary judgment record affirmatively support the claim that Virtual Works had a bad faith intent to profit

when it attempted to sell *vw.net* to Volkswagen. It is true that a mere offer to sell a domain name is not itself evidence of unlawful trafficking. H.R. Conf. Rep. No. 106-464, at 111 (1999). The ACPA was not enacted to put an end to the sale of all domain names. This case, however, involves much more than a plain vanilla offer to sell a domain name.

Indeed, the second piece of direct evidence regarding Virtual Works' intent is the terms of its offer to Volkswagen. Virtual Works told Volkswagen that *vw.net* would be sold to the highest bidder if Volkswagen did not make an offer within twenty-four hours. Virtual Works also stated that others would jump at the chance to own a valuable domain name like *vw.net* because Internet users would instinctively associate the site with Volkswagen. Virtual Works knew, both when it registered *vw.net* and when it offered to sell the site, that consumers would associate *vw.net* with Volkswagen. It sought to maximize the advantage of this association by threatening to auction off the site. And it hoped that in an effort to protect its mark, Volkswagen would respond with a hefty offer of its own.

Likewise, Virtual Works cannot take refuge in the ACPA's safe harbor provision. The safe harbor is only available when the defendant both "believed and had reasonable grounds to believe that the use of the domain name was fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii). The openly admitted hope of profiting from consumer confusion of *vw.net* with the VW mark disqualifies Virtual Works from the ACPA's safe harbor. A defendant who acts even partially in bad faith in registering a domain name is not, as a matter of law, entitled to benefit from the Act's safe harbor provision. Virtual Works knew it was registering a domain name bearing strong resemblance to a federally protected trademark. And it did so, at least in part, with the idea of selling the site "for a lot of money" to the mark's owner.

Just as we are reluctant to interpret the ACPA's liability provisions in an overly aggressive manner, we decline to construe the safe harbor so broadly as to undermine the rest of the statute. All but the most blatant cybersquatters will be able to put forth at least some lawful motives for their behavior. To hold that all such individuals may qualify for the safe harbor would frustrate Congress' purpose by artifi-

cially limiting the statute's reach. We do not think Congress intended the safe harbor to protect defendants operating, at least in part, with unlawful intent.

The ACPA allows a court to view the totality of the circumstances in making the bad faith determination. 15 U.S.C. § 1125(d)(1)(B)(i). Here, that means looking at the purely circumstantial indicia of bad faith, as well as the direct evidence of the statements made at the time of registration and the direct evidence regarding terms of the sale. Whether our decision would be the same in the absence of any particular piece of evidence is a question we need not address. Viewed in its totality, the evidence establishes that at the time Virtual Works proposed to sell *vw.net* to Volkswagen, it was motivated by a bad faith intent to profit from the famousness of the VW mark. This is the sort of misconduct that Congress sought to discourage.

### B.

The second inquiry under the ACPA is whether Virtual Works 1) registered, trafficked in, or used a domain name; 2) that is identical or confusingly similar to a distinctive mark; or 3) is identical, confusingly similar to, or dilutive of a famous mark. 15 U.S.C. § 1125(d)(1)(A)(ii). There is no dispute that Virtual Works registered, trafficked in, and used *vw.net*. There is also no dispute that the VW mark is famous. The sole point of contention is whether *vw.net* is identical, confusingly similar to, or dilutive of Volkswagen's famous VW mark.

Virtual Works claims it is not similar because there is a distinction between the *.net* and *.com* TLD. According to Virtual Works, Volkswagen could not have registered *vw.net* in October of 1996 because it is an automaker and not an Internet service provider. This claim, however, is unavailing in light of the fact that NSI stopped enforcing the *.com*/.net distinction over a year before Virtual Works registered *vw.net*. The claim is also undermined by Virtual Works' admission that at the time of registration it was aware of the potential confusion with the VW mark, and by its statement to Volkswagen that users would instinctively use the *vw.net* address to link to Volkswagen's web site. *Cf. Shade's Landing, Inc. v. Williams*, 76 F. Supp.2d 983, 990 (D. Minn. 1999) ("Because all domain names include one of

these extensions, the distinction between a domain name ending with '.com' and the same name ending with '.net' is not highly significant."). The district court was correct, therefore, in holding that *vw.net* is confusingly similar to the famous VW mark.

### IV.

The remedy that Volkswagen sought in district court was the right to use *vw.net* for itself. The ACPA allows a court to order "the transfer of the domain name to the owner of the mark" if the Act is violated. 15 U.S.C. § 1125(d)(2)(D)(i). Because Virtual Works' violation of the ACPA supports the remedy Volkswagen seeks, we need not address Volkswagen's claims of trademark infringement or dilution.

The ACPA was not enacted to give companies the right to fence off every possible combination of letters that bears any similarity to a protected mark. Rather, it was enacted to prevent the expropriation of protected marks in cyberspace and to abate the consumer confusion resulting therefrom. The resolution of this case turns on the unique facts and circumstances which it presents. Ultimately, we believe the evidence is sufficient to establish that, as a matter of law, Virtual Works attempted to profit in bad faith from Volkswagen's famous mark. 15 U.S.C. § 1125(d)(1)(A). The district court thus did not err in ordering Virtual Works to turn over *vw.net* to Volkswagen. For the foregoing reasons, we affirm the judgment.

*AFFIRMED*