No. 2003-792

NORDIC INN CONDOMINIUM OWNERS' ASSOCIATION

v.

ARLINE A. VENTULLO d/b/a NORDIC INN TOO & a.

Argued: September 9, 2004
Opinion Issued: December 29, 2004

*Winer and Bennett, LLP*, of Nashua (*Gary A. Braun* on the brief and orally), for the plaintiff.

*Cleveland, Waters and Bass, P.A.*, of Concord (*William B. Pribis* on the brief and orally), for the defendants.

DALIANIS, J. The defendants, Arline A. Ventullo d/b/a Nordic Inn Too and Nordic Inn Too, Ltd., appeal an order of the Superior Court (*Burling*, J.) granting the plaintiff's motion for a permanent injunction. The plaintiff, Nordic Inn Condominium Owners' Association (NICOA), cross-appeals, arguing that the court erred in denying its request for monetary damages and attorney's fees under the New Hampshire Consumer Protection Act, *see* RSA ch. 358-A (1995 & Supp. 2004), and the New Hampshire Trade Names Act, *see* RSA 349:10 (1995). NICOA also argues that the court erred in denying its request for monetary damages and attorney's fees under the Federal Anticybersquatting Consumer Protection Act, *see* 15 U.S.C. § 1125(d)(1) (2000), and its request that the defendants be ordered

to transfer, forfeit or cancel six website addresses pursuant to the Act, *see* 15 U.S.C. § 1125(d)(1)(C). We affirm.

The record supports the following facts. NICOA is an unincorporated association of unit owners in a condominium complex known as the Nordic Inn, located in Lincoln. The condominium complex was built in the second half of the 1980's by Bradgate Associates and control of the complex passed from Bradgate to NICOA in the early 1990's. On October 10, 1991, Bradgate assigned to NICOA "the use of the 'Nordic Inn' registered trade name." On November 13, 1991, NICOA registered the trade name "Nordic Inn" with the New Hampshire Secretary of State. At the time of the underlying litigation, that trade name was registered in good standing with the State. The units at the complex are residential vacation properties, and most unit owners rent their units to the public by the day, week or month. NICOA uses a single rental agency to facilitate the rental process; however, there is no requirement that owners use NICOA's rental agent to rent their properties.

When NICOA was initially establishing itself in the market, it encouraged owners who did not rent through the authorized rental agency to use the "Nordic Inn" trade name. For example, one letter, dated April 1, 1990, addressed to "Dear Nordic Inn Homeowner," stated, "If anyone does any type of advertising on your [*sic*] own, be sure to use the name Nordic Inn in the heading. We are getting alot [*sic*] of repeat business ...." Additionally, NICOA allowed owners to purchase brochures from its rental agent for use in their private rental efforts.

Ventullo has owned two units at the condominium complex since 1988. In the early 1990's, she served as a board member of NICOA for two years and was instrumental in forming NICOA's first authorized rental agency, for which she worked. In 1992, Ventullo, acting in her then joint capacity as a NICOA board member and representative of the authorized rental agency, solicited legal advice regarding certain unit owners' wrongful use of the registered trade name "Nordic Inn" while renting and advertising their units. NICOA's legal counsel advised NICOA's board of directors that failure to pursue the individual owners for such use could result in the loss of NICOA's "rights to the exclusive use of that name" and "at a minimum, the Association should place [the offending owners] on notice of its objection to such misuse of the trade name." Despite this advice, NICOA took no action with regard to the use of its trade name.

In 1996, Ventullo, who was no longer associated with the authorized rental agency, formed a Massachusetts corporation called "Nordic Inn Too, Ltd." (NIT) through which she sought to rent her units as well as those of other owners in the complex. At the time she formed the

corporation, Ventullo informed at least one member of the NICOA board of the name she planned to use. At that time, there was no objection by any member of the board to her choice of name.

On January 5, 1998, the defendants registered a website address, *www.nordicinn.com*, through which they advertised their rental agency. On September 22, 1999, NICOA solicited the defendants, among others, to act as its authorized rental agent, but NICOA did not select the defendants. On October 14, 1999, the authorized rental agency registered a website, *www.nordicinnresort.com*. During 2000, the first full year of operation, the authorized rental agency's website directly or indirectly generated twenty-four percent of NICOA's bookings, and in its second and third years of operation it generated approximately thirty-four percent and thirty-nine percent of bookings respectively. By 2003, the fourth full year of operation, the website generated fifty percent of NICOA's bookings.

Because the defendants are not the authorized rental agency, they do not operate through an agent located at the inn who conducts business, receives guests, and handles guest complaints. Instead, the defendants' guests pick up their keys at a nearby gas station and the defendants handle guest requests or complaints by telephone. As Internet bookings became a more important factor in its business, NICOA noticed that many of the defendants' guests would approach the authorized rental agency in the main office to request towels, new keys, or to lodge various complaints. Frequently, NIT renters were confused and visibly upset with NICOA's agents when they learned there were no on-site services or any staff available to assist them.

On August 26, 2002, counsel for NICOA sent a letter to the defendants demanding that they "permanently cease and desist all use of . . . the trade name 'Nordic Inn' . . . [and] terminate [their] registration of the domain name *www.nordicinn.com* . . . ." Ventullo responded in a September 7, 2002 letter, stating that the defendants would be willing to make some minor changes, but that after years of developing this site and building a successful business, they were unwilling to voluntarily relinquish the domain name. On October 5, 2002, the defendants registered the Internet website addresses www.nordicinn.net, www.nordicinn.org, www.nordicinn.biz, www.nordicinn.info, and www.nordicinn.us. NICOA filed suit on October 7, 2002.

After a hearing on the merits, the trial court issued an order granting NICOA's request for a permanent injunction specifically enjoining the defendants from using the trade name "Nordic Inn" as part of any corporate name in New Hampshire or as part of a domain name in

connection with their business. However, the court denied NICOA's request for monetary damages and attorney's fees under RSA chapter 358-A and RSA 349:10. The court also denied NICOA's request for damages and attorney's fees under 15 U.S.C. § 1125(d)(1), as well as its request that the defendants be ordered to transfer, forfeit or cancel their domain names pursuant to 15 U.S.C. § 1125(d)(1)(C). The defendants appeal the trial court's issuance of the permanent injunction, while NICOA cross-appeals the trial court's refusal to award monetary damages and attorney's fees and refusal to order the defendants to transfer, forfeit or cancel their six website addresses.

## I. Injunctive Relief

The defendants first argue that the trial court erred in granting the permanent injunction because they have a contractual right to the use of the "Nordic Inn" name, citing Article 15-100 in the "Declaration of Condominium," which provides:

> The Board [of Directors] may acquire and hold, for the benefit of the Owners, tangible and intangible personal property and may dispose of the same by sale or otherwise; and the beneficial interest in such property shall be owned by the Owners in the same proportion as their respective shares in other Common Area. A transfer of a Unit shall transfer to the transferee ownership of the transferor's beneficial interest in such personal property, whether or not such personal property is specifically mentioned therein.

A condominium association's legal documents are a contract that governs the legal rights between the association and property owners. *Schaefer v. Eastman Community Assoc.*, 150 N.H. 187, 190 (2003). As is the case with any contract, the interpretation of a condominium's declaration is a question of law, which we review *de novo*. *Id.* at 191. The defendants argue that Ventullo, as the owner of a beneficial interest in the personal property acquired and held by the condominium association, is entitled to use the "Nordic Inn" name "in connection with advertising and promoting the rental of units at the Nordic Inn Condominium complex," including the right to assign such ownership to NIT. We disagree.

It is undisputed that trademark rights qualify as intangible personal property. *See* BLACK'S LAW DICTIONARY 1233 (7th ed. 2000) (defining personal property as "[a]ny movable or intangible thing that is subject to ownership and not classified as real property"). A beneficial interest is

defined as "[a] right or expectancy in something (such as a trust or an estate), *as opposed to legal title* to that thing." *Id.* at 149 (emphasis added). The provision cited by the defendants provides nothing more than a beneficial interest in the tangible and intangible personal property held by the board of directors, subject to certain fiduciary duties that the board may owe the condominium owners, and the defendants have no contractual right to appropriate such personal property. For example, the board may have acquired certain computer equipment and other office supplies, which qualify as tangible personal property, that it uses for administrative tasks. Following the logic of the defendants' argument, any one of the approximately 100 condominium owners could at any time for any reason take those supplies and assign them to a corporation. Such an argument is without merit. Just as an individual condominium owner may not appropriate the association's computer equipment and other office supplies, an individual condominium owner may not appropriate the association's trade name.

The defendants next argue that the trial court should have applied the doctrine of estoppel by laches to bar NICOA's request for a permanent injunction. Laches is an equitable doctrine that bars litigation when a potential plaintiff has slept on its rights. *Appeal of City of Laconia,* 150 N.H. 91, 93 (2003). Laches, unlike limitation, is not triggered by the mere passage of time, but is principally a question of the inequity of permitting a claim to be enforced. *Id.; see also In the Matter of State ex. rel. Reitenour & Montgomery,* 148 N.H. 358, 362 (2002). In general, when determining whether the doctrine should apply to bar a suit, the court should consider: (1) the knowledge of the plaintiffs; (2) the conduct of the defendants; (3) the interests to be vindicated; and (4) the resulting prejudice. *Appeal of City of Laconia,* 150 N.H. at 93. Ordinarily, laches will constitute a bar to suit only if the delay was unreasonable and has resulted in unfair prejudice. *Healey v. Town of New Durham,* 140 N.H. 232, 241 (1995).

"In a trademark case, courts may apply the doctrine of estoppel by laches to deny relief to a plaintiff who, though having knowledge of an infringement, has, to the detriment of the defendant, unreasonably delayed in seeking redress." *Sara Lee Corp. v. Kayser-Roth Corp.,* 81 F.3d 455, 461 (4th Cir.), *cert. denied,* 519 U.S. 976 (1996); *see also Profitness Physical Therapy v. Pro-Fit Orthopedic,* 314 F.3d 62, 67 (2d Cir. 2002) ("We have long held in the context of trademark actions that where a person entitled to exclusive use of a trademark is guilty of unreasonable delay in asserting his rights against an infringer . . . a court of equity has the discretionary power . . . to deny injunctive relief or an accounting."

(quotation and brackets omitted)); 5 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 31.2, at 31-13 (4th ed. 2004) ("Estoppel by laches [is] defined as that type of delay in filing suit which causes prejudice to defendant and when weighed with all other relevant equitable factors, results in a bar to relief, either injunctive or monetary, or both." (citation and internal quotation marks omitted)).

A finding of laches hinges upon the particular facts of each case, and a trial court has wide latitude when deciding whether the circumstances justify the application of the doctrine. *Reitenour & Montgomery*, 148 N.H. at 362.

Unless we find that the trial court's decision is unsupported by the evidence or erroneous as a matter of law, we will not overturn it. *Id.*

The trial court chose not to apply laches to bar NICOA's request for a permanent injunction because it determined that the exponential increase in the use of the Internet "[was] a change of conditions that prevents the [defendants] from barring all relief for infringement of the Nordic Inn trade name or trademarks associated with it." The trial court, relying upon *Healey*, 140 N.H. at 241, found that though "NICOA could see [the defendants'] website ... it could not know in 1998 that websites would provide 50% of the rental bookings in 2003. They could only speculate that [the defendants'] use of [www.nordicinn.com] would cause them actual harm." The court, therefore, excused NICOA's delay, and granted NICOA's request for an injunction because it found that a likelihood of confusion existed concerning the defendants' uses, relying in part upon the "actual confusion shown by some of the NIT guests in the Nordic Inn as to NICOA's agent at the front desk, from whom they expect[ed] to elicit aid." While we conclude that the trial court erred in excusing NICOA's delay, we will, nonetheless, uphold the court's decision not to apply laches because we hold that the interest in preventing public confusion outweighs the prejudice caused by NICOA's unreasonable delay.

The trial court erred in its reliance upon *Healey* when excusing NICOA's delay. In *Healey*, a party filed a complaint concerning a two-family dwelling built under a zoning ordinance that permitted only one-family dwellings. We found that laches did not apply to bar the complaint, despite a four-year delay in filing the complaint, because, from the outside, the Healeys could not have discerned whether the house was a one- or two-family dwelling; they could only speculate. *Healey*, 140 N.H. at 242. We relied upon the principle that laches "cannot be imputed to a party who is ignorant of the facts creating [its] right." *Id. Healey* does not fit the facts of this case because NICOA was aware of the facts creating its right to enforce its trade name in 1996, when Ventullo informed the board that she

was incorporating NIT. NICOA's right did not depend upon the actual confusion caused by the exponential increase in the use of the Internet. Although "[e]vidence of actual confusion is undoubtedly the best evidence of likelihood of confusion[,] a lack of such evidence [of actual confusion] is rarely significant and the factor of actual confusion is weighted heavily only when there is evidence of past confusion, or perhaps, when the particular circumstances indicate such evidence should have been available." *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 798-99 (6th Cir. 2004) (quotations, citation and brackets omitted). As NICOA was aware of the defendants' infringing use from its inception, the evidence does not support the trial court's decision to excuse NICOA's delay.

NICOA argues that even if its delay was not excused, laches should not apply because its delay was reasonable. NICOA contends that its "rights were simply not detrimentally affected until the time when the [I]nternet became a substantial, if not predominant, source of the bookings for rentals . . . ." In support of its argument, NICOA advances the proposition that a senior user has no obligation to sue until the "likelihood of confusion looms large." *Sara Lee*, 81 F.3d at 462. We are not persuaded by NICOA's argument for two reasons. First, as we have already pointed out, the factual finding of a likelihood of confusion does not depend upon a showing of actual confusion. More importantly, however, NICOA employs the above principle out of context.

■ The general rule that a trademark owner has no obligation to sue until the likelihood of confusion looms large exists in cases involving fact patterns in which a trademark owner has demonstrated progressive encroachment upon its rights, such as a slow territorial expansion, or an escalation of or change in use by the defendant. *See* MCCARTHY, *supra* § 31:19, at 31-54 to 31-55. As the Second Circuit Court of Appeals explained:

> The primary rationale is that a plaintiff should not be obligated to sue until its right to protection has ripened such that plaintiff knew or should have known, not simply that defendant was using the potentially offending mark, but that plaintiff had a provable infringement claim against defendant. Any other rule would require each trademark owner to sue first and ask questions later, and would foster meritless litigation. The doctrine of progressive encroachment, therefore, focuses the court's attention [upon] the question of whether defendant, after beginning its use of the mark, redirected its business so that it

more squarely competed with plaintiff and thereby increased the likelihood of public confusion of the marks.

*Profitness*, 314 F.3d at 70 (quotation, citations and brackets omitted). In this case, the facts demonstrate that the defendants did not progressively encroach upon NICOA's trade name over time. From the very first day the defendants "squarely competed" with NICOA: the defendants and NICOA, at all times, marketed to the same geographic region and the same customer base, and dealt in the same services.

Even if we were to accept the argument that the defendants' use of its website constituted a change or escalation in the defendants' use of the trade name "Nordic Inn," NICOA solicited the defendants' services as a potential rental agent more than one year *after* the defendants had established their website, and failed to object until more than four years after such use. To the extent that NICOA relies upon the case of *Great Eastern Resort v. Virtual Resort Solutions*, 189 F. Supp. 2d 469 (W.D. Va. 2002), to support its argument that it reasonably delayed in asserting its rights against the defendants' use of the domain name, we find such reliance to be inapposite. In *Great Eastern*, the district court specifically found that the plaintiff's several-year delay was not unreasonable because "[t]he plaintiff only became aware of the defendants' website and related domain names *in their current form* about seven months before filing this suit." *Great Eastern*, 189 F. Supp. 2d at 480 (emphasis added). In the present case, NICOA does not argue that the defendants, at any time, changed the form of their website.

NICOA's argument is especially hollow considering that it was informed by its own counsel in 1992, four years prior to the defendants' infringing use, that it could lose exclusive rights in its trade name if it continued to allow parties to trade on it. NICOA had the right to protect its trade name, prior to the public confusion demonstrated in 2002. While the increase in Internet bookings may not have been obvious, the likelihood of confusion regarding the defendants' use of the domain name www.nordicinn.com, and corporate name "Nordic Inn Too," *was* obvious. The facts demonstrate that NICOA did not take prompt action to discourage the defendants from trading on its name; indeed, the only actions NICOA did take during that time period could reasonably be viewed as encouraging the defendants' use. Therefore, we conclude that NICOA's delay in asserting its rights was unreasonable.

We also conclude that the defendants relied upon NICOA's delay to their detriment, as reflected by advertising expenses and efforts in configuring and promoting their website and in generating good will

associated with their corporate name and website. Furthermore, we reject NICOA's argument that the defendants engaged in conscious wrongdoing, as the defendants informed NICOA of their action and NICOA itself solicited the defendants' business three years after the now alleged wrongdoing. *See Healey*, 140 N.H. at 242.

Nonetheless, we hold that the trial court properly granted NICOA's request for a permanent injunction because the defendants failed to demonstrate that the equities lie in their favor. "Given the strong interest in preventing public confusion, . . . a plaintiff's apparent . . . delay in bringing suit does not necessarily bar relief." *Profitness*, 314 F.3d at 68; *see also* McCARTHY, *supra* § 31:10, at 31-36. "A trademark infringement suit raises issues not confined to the traditional two-party adversary battle . . . ." McCARTHY, *supra* § 31:10, at 31-34. "If plaintiff's sloth in suing results in the denial of injunctive relief, and the marks are clearly confusing, the relevant customer group will not be served by the result." *Id.* "The public interest in avoiding confusion and mistake requires that the doctrine[] of laches . . . not be 'rigidly applied' when a strong showing of a likelihood of confusion is made." *Resorts of Pinehurst, Inc. v. Pinehurst Nat. Corp.*, 148 F.3d 417, 423 (4th Cir.), *cert. denied*, 525 U.S. 1051 (1998) (quoting *Sara Lee*, 81 F.3d at 463); *see also* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 31 comment *e* at 323 (1993).

While the defendants may have built up some equity in www.nordicinn.com and the corporate name "Nordic Inn Too," that equity was gained subject to the risk of a later finding of public confusion. Although NICOA's delay was unreasonable, and although the defendants have been prejudiced by that unreasonable delay, when examining the propriety of a future injunction in the case of trademark protection, we are concerned with more than just the two litigating parties.

■ When choosing a trade name—even if the potentially wronged party does not object—defendants must consider the potential effects of their actions upon the consuming public. NICOA presented evidence to the trial court of substantial recent public confusion, and we conclude that any prejudice the defendants may suffer is outweighed by the interest in protecting the public from future confusion. *See Resorts of Pinehurst*, 148 F.3d at 423 (granting a permanent injunction, despite claim of laches, based upon plaintiff's "strong proof of likelihood of confusion—indeed, actual confusion"). Therefore, we hold that the equities do not lie in the defendants' favor, and conclude that the evidence compels the trial court's decision not to apply the doctrine of laches as a bar to NICOA's request for injunctive relief.

While we recognize that "underlying equities may nevertheless affect the scope of injunctive relief, with absolute prohibitions against use sometimes displaced by mandatory precautionary measures such as disclaimers or labelling requirements in an attempt to ameliorate the prejudice to the defendant[,]" RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 31 comment *e* at 323, here the evidence supports the trial court's finding that no such labeling or posting of disclaimers on the defendants' website could have cured the ill effects of the defendants' continued use of www.nordicinn.com. Additionally, the evidence supports the trial court's implicit finding that part of the confusion demonstrated in this case resulted from the defendants' use of the corporate name "Nordic Inn Too."

*II. Damages and Attorney's Fees*

We now examine NICOA's argument that the trial court erred in applying laches to its request for damages and attorney's fees under RSA chapter 358-A and RSA 349:10. NICOA claims that the defendants' actions violated RSA 358:A-2, II, III, V, and argues that, under RSA 358-A:10, I, it should be awarded various damages and attorney's fees. Additionally, NICOA claims that it should be awarded damages and attorney's fees under RSA 349:10. The defendants argue that NICOA's requests for damages are barred by the statute of limitations and the doctrine of estoppel by laches. The trial court found that laches applied to bar NICOA's request for monetary damages and attorney's fees because of the defendants' "credible evidence that they could reasonably have believed their use of the 'Nordic Inn' trade name" was legitimate and because laches is "a defense to trade name and trademark infringement actions."

NICOA did not file suit until 2002, six years after it learned that the defendants began using the name "Nordic Inn Too," and four years after it learned that the defendants were using www.nordicinn.com. Trademark infringement is widely recognized, however, as being of a continuing nature, "which repeatedly give[s] rise to a fresh cause of action so long as the wrong persists." 4 R. CALLMAN, CALLMAN ON UNFAIR COMPETITION, TRADEMARKS, AND MONOPOLIES § 23:31, at 23-253 (4th ed. 2003); *see, e.g., R.C. Bigelow, Inc. v. Liberty Mut. Ins. Co.*, 287 F.3d 242, 248 (2d Cir. 2002). "Under this rule, although the initial tortious act may have occurred longer than the statutory period prior to the filing of an action, an action will not be barred if it can be based upon the continuance of that tort within that period." CALLMAN, *supra* § 23:31, at 23-253 to 23-254. However, courts are split as to whether a plaintiff may recover all of its

claimed damages under the "continuing wrong" doctrine. *Compare Blazer Foods v. Restaurant Prop*, 673 N.W.2d 805, 809 (Mich. Ct. App. 2003) ("Under the continuing wrong doctrine, an alleged timely actionable event will allow consideration of and damages for connected conduct that would be otherwise barred." (quotation omitted)) *with Balke v. Central Missouri Elec. Co-op.*, 966 S.W.2d 15, 20 (Mo. Ct. App. 1997) ("[W]here there is a continuing wrong, the statute of limitations does not work as a complete time-bar of a claim, but only works to bar those damages which accrued prior to the statutory period in question.").

Though the statute of limitations does not act to completely bar NICOA's claims, the doctrine of estoppel by laches may still be applicable because "the concept of a 'continuing wrong' . . . does not apply to laches," CALLMAN, *supra* § 23:23, at 23-211. "[W]hen the obligation arises to assert an objection to a trademark registration, that obligation is not postponed by continued use of the trademark." *Bridgestone/Firestone v. Auto. Club De L'Ouest*, 245 F.3d 1359, 1364 (Fed. Cir. 2001). Laches is viewed "as a single defense to a continuing tort up to the time of suit, not a series of individual defenses which must be proved as to each act of infringement, at least with respect to infringing acts of the same nature." *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1031 (Fed. Cir. 1992). As courts have recognized, "the notion of a 'continuing wrong' is a strong justification for application of the doctrine of laches, for a party aggrieved by a trademark use could delay filing suit indefinitely, while prejudice to the trademark user increases." *Bridgestone/Firestone*, 245 F.3d at 1364; *see also* CALLMAN, *supra* § 23:23, at 23-211.

Laches is an affirmative defense and the defendants bear the burden of proving that laches is applicable and that the equities lie in their favor. *See* CALLMAN, *supra* § 23:21, at 23-175. Although we held that laches did not apply to the plaintiff's request for an injunction, courts require greater diligence "in bringing the action when [damages and] an accounting for profits is sought than is required when an injunction is prayed for against future infringements or acts of unfair competition." 74 AM. JUR 2D *Trademarks and Tradenames* § 148 (2001); *see also Profitness*, 314 F.3d at 68; CALLMAN, *supra* at § 23:22, at 23-181.

██ The law generally requires that a plaintiff take prompt action in enforcing trademark rights, not only to protect defendants who have been "lulled into a false sense of security" and acted in reliance thereon, MCCARTHY, *supra* § 31:12, at 31-41 (quotation omitted), but also to protect the consuming public from confusion. Were NICOA permitted to recover damages, plaintiffs would be encouraged to delay bringing suit, knowing

that they may wait "for defendant to build up its business and profits and years later file[] suit and demand[] an accounting of those profits," McCARTHY, *supra* § 31:4, at 21. Furthermore, NICOA's delay in seeking damages undercuts its claim that past profits generated by the defendants were due to actual public confusion. *See* McCARTHY, *supra* § 31:11, at 31-38. We conclude that the equities lie in the defendants' favor on this issue because the defendants were prejudiced by NICOA's unreasonable delay and the public interest in trademark owners seeking prompt relief is not served by awarding NICOA damages. Because NICOA's claims for damages under RSA 358-A:10, I, and RSA 349:10 are barred by laches, its claims for attorney's fees under those statutes must also fail.

### III. Anticybersquatting Consumer Protection Act

Finally, we address NICOA's argument regarding the application of 15 U.S.C. § 1125(d)(1) of the Anticybersquatting Consumer Protection Act (ACPA) to this case. NICOA argues that the trial court erred in finding that the defendants did not violate the ACPA, and contends that the defendants acted with bad faith intent to profit and do not qualify for the safe harbor. For the reasons that follow, we hold that the trial court correctly denied NICOA's claims under the ACPA.

The ACPA seeks to combat domain name piracy by allowing a trademark owner to bring a civil action against a person who, without regard to the goods and services of the parties: (1) "has a bad faith intent to profit from that mark," 15 U.S.C. § 1125(d)(1)(A)(i); and (2) "registers, traffics in, or uses a domain name that ... in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark," 15 U.S.C. § 1125(d)(1)(A)(ii)(I).

The ACPA provides that it applies to all domain names registered before, on, or after November 29, 1999, the date of its enactment, except that damages available under 15 U.S.C. § 1117(a) and (d) are not available with respect to the registration, trafficking or use of a domain name that occurs prior to November 29, 1999. Pub. L. No. 106-113, § 3010, 113 Stat. 1536, 1501A-552 (Nov. 29, 1999); 15 U.S.C. § 1117 (2000); *see People for Ethical Treatment/Animals v. Doughney*, 263 F.3d 359, 368 (4th Cir. 2001). However, "the fact that a domain name was registered before the Act's passage does not absolve the registrant from liability for post-enactment trafficking or use." *Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 547 (6th Cir. 2003).

Under 15 U.S.C. § 1127 (2000), a domain name is defined as "any alphanumeric designation which is registered with or assigned by any domain name registrar, domain name registry, or other domain name

registration authority as part of an electronic address on the Internet." The Eighth Circuit Court of Appeals explained:

> A domain name typically consists of a top level domain extension, such as .com, .org, or .net, and a second level domain name, such as pepsi in pepsi.com. Because all domain names end with a top level domain suffix like .com or .org, and domain registrars no longer enforce distinctions between the types of entities that may register names with these extensions, courts generally look to the second level domain name to determine whether it is identical or confusingly similar to a given mark.

*Coca-Cola Co. v. Purdy*, 382 F.3d 774, 783-84 (8th Cir. 2004) (citation omitted); *see also* S. REP. NO. 106-140, at 10 (1999).

The ACPA lists nine non-exclusive factors that a court may consider when determining whether a person has the bad faith intent that is necessary to recover under the Act:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;

> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

> (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

> (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

> (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous . . . .

15 U.S.C. § 1125(d)(1)(B)(i); *see TMI, Inc. v. Maxwell*, 368 F.3d 433, 438 (5th Cir. 2004).

"The first four factors have been seen as reasons why a defendant might in good faith have registered a domain name incorporating someone else's mark, and the other five are indicia of bad faith intent." *Coca-Cola Co.*, 382 F.3d at 785. In other words, factors I through IV can be seen as factors that may weigh in a defendant's favor, while factors V through IX can be seen as those that might weigh against a defendant. Further, courts are not limited "to considering just the listed factors when making [a] determination of whether the statutory criterion has been met." *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 498 (2d Cir. 2000). There may be "unique circumstances . . . which do not fit neatly into the specific factors enumerated by Congress but may nevertheless be considered under the statute." *Id.* at 499. "The ACPA allows a court to view the totality of the circumstances in making the bad faith determination." *Virtual Works, Inc. v. Volkswagen of America, Inc.*, 238 F.3d 264, 270 (4th Cir. 2001).

The Act also includes a safe harbor provision, which provides that bad faith intent to profit "shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii). The safe harbor functions as "an 'escape clause' to those whose conduct would otherwise constitute bad faith . . . ." *Northern Light Technology v. Northern Lights Club*, 236 F.3d 57, 64 (1st Cir. 2001). In *Virtual Works*, the Fourth Circuit Court of Appeals cautioned that the safe harbor provision should not be construed "so

broadly as to undermine the rest of the statute." *Virtual Works*, 238 F.3d at 270. As the Fourth Circuit explained, "All but the most blatant cybersquatters will be able to put forth at least some lawful motives for their behavior. To hold that all such individuals may qualify for the safe harbor would frustrate Congress' purpose by artificially limiting the statute's reach." *Id.*

In this case, the trial court determined that the defendants' registration and use of www.nordicinn.com did not violate the ACPA because their conduct fell within the safe harbor. The trial court did not make, however, an explicit finding as to whether the nine non-exclusive ACPA factors, *see* 15 U.S.C. § 1125(d)(1)(B)(i), would indicate that the defendants had bad faith intent to profit from their registration and use of www.nordicinn.com. Because the safe harbor functions as an "escape clause," a finding that the factors did not indicate bad faith intent would have eliminated the need to employ the safe harbor. *See TMI, Inc.*, 368 F.3d at 440 (determining that ACPA claim failed without reaching the safe harbor provision). Since we assume that the trial court made the subsidiary findings necessary to support its general finding that the safe harbor applied, *see Small v. Zoning Bd. of Adj., Town of Newbury*, 121 N.H. 226, 229 (1981); *Simpson v. Calivas*, 139 N.H. 1, 13 (1994), and since the result is the same regardless of whether the trial court chose to apply the safe harbor because it found bad faith intent or because it misapprehended the ACPA statutory scheme, our analysis of the trial court's application of the safe harbor provision will assume a finding of bad faith intent. We will uphold the trial court's ultimate finding of fact unless we find that its decision is unsupported by the evidence or erroneous as a matter of law. *Porter v. Town of Sanbornton*, 150 N.H. 363, 369 (2003).

The trial court, in applying the safe harbor, found that the defendants had reasonable grounds to believe that their conduct was lawful, because: (1) the defendants registered www.nordicinn.com after NICOA had registered www.nordicinnresort.com; (2) the defendants' use of the domain name was uncontested for a period of years; (3) the domain name was an extension of the defendants' corporate name; and (4) the domain name described a physical structure within which the defendants held certain rights. NICOA filed a motion for reconsideration in which it argued that the record showed that the defendants had registered www.nordicinn.com prior to NICOA's registration of its website address, thus disputing the trial court's first ground for finding that the safe harbor was applicable. The trial court denied NICOA's motion, ruling that the motion "raises neither issues of fact or [*sic*] law which were not previously considered by

the Court *or which would warrant a different result* than that determined by the Court" in its previous order.

On appeal NICOA argues that the trial court made an erroneous finding of fact that the defendants registered www.nordicinn.com subsequent to NICOA's registration of www.nordicinnresort.com, and, thus, the trial court's finding that the defendants had reasonable grounds to believe that their conduct was lawful must be reversed. We first note that the record clearly shows that the defendants registered www.nordicinn.com prior to NICOA's registration of www.nordicinnresort.com. Even though the trial court erred in this finding, we agree with the trial court that this error does not warrant a different result, because its other stated grounds support its ultimate finding that the defendants had reasonable grounds to believe that their conduct was lawful.

First, the defendants had used their corporate name "Nordic Inn Too" for two years prior to their registration of www.nordicinn.com, which prior use was uncontested by NICOA. The defendants' registration was then uncontested for approximately four additional years, even though NICOA possessed the right to bring an action against the use of that web address simply by filing a common law action for an injunction. NICOA's failure to object, despite the available remedy, supports the finding that the defendants *reasonably* believed that their actions were lawful. The defendants also possessed rights in the property at Nordic Inn, unlike one who uses a name that is unconnected to its business or property. Taken as a whole, these factors are sufficient to support the trial court's finding that the defendants had *reasonable* grounds to believe that their registration and use of www.nordicinn.com was lawful.

NICOA also appeals the trial court's decision to apply the safe harbor to the defendants' registration of the "nordicinn" .net, .org, .us, .biz and .info domain extension variations. The trial court stated, "As to the registration of the other domain [extension variations,] . . . since Ms. Ventullo made a *bona fide* offering of services under the www.nordicinn.com [website], she could reasonably wish to protect that name by registering other variants upon it, particularly when faced with a lawsuit" to take the domain name away. Assuming, once again, that the court determined that such action suggested bad faith intent under 15 U.S.C. § 1125(d)(1)(B)(i), we find the decision to apply the safe harbor to such action to be supported by the facts of this case. The main concern of the ACPA, with respect to the registration of variations on a domain name, is that someone will warehouse those names and hold the trademark owner hostage in an effort to sell those names at monopoly level prices. *See Lucas Nursery and Landscaping, Inc. v. Grosse*, 359 F.3d 806, 810 (6th Cir. 2004). Simply put,

there is no such action present in this case. We conclude that it was reasonable for the trial court to find that the defendants could reasonably wish to protect the domain name "nordicinn" in which, as stated above, they reasonably believed that they had lawful rights.

NICOA next argues that the trial court's application of the safe harbor conflicts with its earlier decision to grant an injunction because "[s]uch use cannot be violative of the law on the one hand so as to constitute grounds to enjoin further use of a protected property interest, while at the same time being adjudged lawful so as to qualify for safe harbor protection." We do not find NICOA's argument persuasive because the application of the safe harbor does not depend upon whether the defendants' actions were lawful; rather, it depends upon whether the defendants believed and had reasonable grounds to believe such actions were lawful.

NICOA cites *Virtual Works*, which, among other things, stands for the proposition that the safe harbor must not be applied in a way that would undermine the overall objectives of the statute. *Virtual Works*, 238 F.3d at 270. In *Virtual Works*, Volkswagen (VW) sued Virtual Works over its registration and use of the website www.vw.net after Virtual Works had offered to sell it the site. *Id.* at 267. Virtual Works argued that the safe harbor should apply, despite a finding of bad faith, because it had operated *vw.net* as part of an Internet Service Provider business for two years. *Id.* at 269-70. The Fourth Circuit found that this reason was not dispositive because it concluded, "Virtual Works chose *vw.net* over other domain names not just because 'vw' reflected the company's own initials, but also because it foresaw the ability to profit from natural associations of *vw.net* with the VW mark." *Id.* at 269-70. The court based this conclusion in part upon the obvious association of *vw.net* and VW, but also upon direct evidence that Virtual Works attempted to sell the site to VW, and "told Volkswagen that *vw.net* would be sold to the highest bidder if Volkswagen did not make an offer within twenty-four hours . . . [and] that others would jump at the chance to own a valuable domain name like *vw.net* because Internet users would instinctively associate the site with Volkswagen." *Id.* at 270. The Fourth Circuit explained that the "openly admitted hope of profiting from consumer confusion of *vw.net* with the VW mark disqualifies Virtual Works from the ACPA's safe harbor." *Id.*

██ Like the defendant in *Virtual Works*, the defendants here operated their website as part of a legitimate business; however, unlike the defendants in *Virtual Works*, there were no offers to sell the domain name in the present case, no threats, and no openly admitted hopes of profiting from consumer confusion. In the Senate Report accompanying the ACPA:

cybersquatters are defined as those who: (1) "register well-known brand names as Internet domain names in order to extract payment from the rightful owners of the marks;" (2) "register well-known marks as domain names and warehouse those marks with the hope of selling them to the highest bidder;" (3) "register well-known marks to prey on consumer confusion by misusing the domain name to divert customers from the mark owner's site to the cybersquatter's own site;" (4) "target distinctive marks to defraud consumers, including to engage in counterfeiting activities."

*Lucas Nursery*, 359 F.3d at 809 (quoting S. REP. NO. 106-140, at 5-6). The activity that occurred in *Virtual Works* was precisely the type of activity that the ACPA was designed to target, meeting three of the four criteria of the Senate Report. The defendants' actions in this case, on the other hand, were not of that type. The defendants did not attempt to warehouse marks, extort money from NICOA, prey on consumer confusion by registering a *well-known* mark, or engage in counterfeiting. We conclude that the facts and circumstances of this case support the trial court's implicit finding that the application of the safe harbor to the defendants' conduct would not undermine the overall objectives of 15 U.S.C. § 1125(d)(1). As such, the trial court correctly denied the NICOA's requests for all forms of relief under the ACPA.

## IV. Conclusion

We hold that the trial court properly granted NICOA's request for a permanent injunction because it correctly rejected the defendants' contractual claim to the trade name "Nordic Inn." In addition, we hold that the court correctly rejected the defendants' request for the application of laches, with respect to the injunction, even though it did so for the wrong reason. We further hold that the trial court properly applied laches when denying NICOA's request for monetary damages and attorney's fees pursuant to RSA chapter 358-A and RSA 349:10. Finally, we hold that the trial court correctly determined that the defendants reasonably believed that their conduct was lawful, and correctly denied NICOA's claims for relief under the ACPA.

*Affirmed.*

BRODERICK, C.J., and NADEAU, DUGGAN and GALWAY, JJ., concurred.